**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| In re: SHAWE & ELTING LLC | ) | C.A. No. 9661-CB |
| | ) | |
| PHILIP R. SHAWE, derivatively on behalf of TRANSPERFECT GLOBAL, INC., and in his individual capacity, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 9686-CB |
| ELIZABETH ELTING, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| TRANSPERFECT GLOBAL, INC., | ) ) | |
| Nominal Party. | ) ) | |
| In re: TRANSPERFECT GLOBAL, INC. | ) | C.A. No. 9700-CB |
| | ) | |
| ELIZABETH ELTING, | ) ) | |
| Petitioner, | ) ) | |
| v. | ) | C.A. No. 10449-CB |
| PHILIP R. SHAWE and SHIRLEY SHAWE, | ) ) | |
| Respondents, | ) ) | |
| and | ) ) | |
| TRANSPERFECT GLOBAL, INC., | ) ) | |
| Nominal Party. | ) | |

**MEMORANDUM OPINION**

Date Submitted: June 3, 2015
Date Decided: August 13, 2015

Kevin R. Shannon, Berton W. Ashman, Jr., Christopher N. Kelly, Jaclyn C. Levy and Matthew A. Golden of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Kurt M. Heyman and Melissa N. Donimirsky of PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; Philip S. Kaufman, Ronald S. Greenberg, Marjorie E. Sheldon and Jared I. Heller of KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; Gerard E. Harper and Robert N. Kravitz of PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Elizabeth Elting*.

Gregory P. Williams, Lisa A. Schmidt and Robert L. Burns of RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Peter B. Ladig, Brett M. McCartney and Kyle Evans Gay of MORRIS JAMES LLP, Wilmington, Delaware; Paul D. Brown of CHIPMAN BROWN CICERO & COLE LLP, Wilmington, Delaware; Philip L. Graham, Jr. and Penny Shane of SULLIVAN & CROMWELL LLP, New York, New York; Howard J. Kaplan and Joseph A. Matteo of KAPLAN RICE LLP, New York, New York; Ronald C. Minkoff and Andrew Ungberg of FRANKFURT KURNIT KLEIN & SELZ, P.C., New York, New York; *Attorneys for Philip R. Shawe.*

Susan W. Waesco and Christopher P. Quinn of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jay S. Auslander, Natalie Shkolnik and Julie Cilia of WILK AUSLANDER LLP, New York, New York; *Attorneys for Shirley Shawe.*

**BOUCHARD, C.**

This post-trial decision chronicles the tumultuous relationship of two individuals who started a company in a college dormitory room over twenty years ago. They currently serve as the co-CEOs and the only two directors of the company, which is now a Delaware corporation. Elizabeth Elting owns 50% of the corporation. Philip R. Shawe owns 49%. The remaining 1% is owned by Shawe's mother, Shirley Shawe, who is firmly aligned with him.

The primary issue for decision is whether the Court should grant Elting's petition to appoint a custodian to sell the corporation under 8 *Del. C.* § 226 even though the corporation is highly profitable. Although it is unusual to grant such relief, it is appropriate and necessary in this case.

As explained in painstaking detail below, the state of management of the corporation has devolved into one of complete dysfunction between Shawe and Elting, resulting in irretrievable deadlocks over significant matters that are causing the business to suffer and that are threatening the business with irreparable injury, notwithstanding its profitability to date. The stockholders of the corporation have stipulated to their inability to elect successor directors, and there is no prospect they will do so in the future. The requirements of both 8 *Del. C.* §§ 226(a)(1) and (a)(2) thus have been satisfied, and the appointment of a custodian to sell the corporation, with a view toward maintaining the business as a going concern and maximizing value for the stockholders, affords the only just and viable remedy under the unique circumstances of this case.

Shawe and Elting have asserted a variety of other claims, all of which are denied for reasons explained below except one. Elting's request under 6 *Del. C.* § 18-802 to

1

dissolve a separate limited liability company holding approximately $8 million in liquid assets that she and Shawe own 50-50 is granted because it is not reasonably practicable to carry on the business in conformity with the ostensible purposes for which the company was formed.

## I. BACKGROUND

These are the facts as I find them based on the documentary evidence and witness testimony.[1] I accord the evidence the weight and credibility I find it deserves.

### A. The Parties

TransPerfect Global, Inc. ("TPG") is a Delaware corporation with its headquarters in New York, New York. TPG wholly owns TransPerfect Translations International, Inc. ("TPI"), a New York corporation, which is TPG's main operating company. For most purposes, the distinction between TPG and its subsidiaries, including TPI, is not relevant and thus they are referred to collectively as the "Company."

The Company is one of the world's leading providers of translation, website localization, and litigation support services. It has 92 offices in 86 cities worldwide, employs more than 3,500 full-time employees, and maintains a network of more than 10,000 translators, editors and proofreaders working in approximately 170 different languages.

---

[1] Deposition testimony is part of the trial record. Pre-Trial Stip. and Order ("Pre-Trial Stip.") ¶ 132. Any objections to testimony or trial exhibits used in this opinion are overruled.

2

Elizabeth (Liz) Elting and Philip (Phil) Shawe are the co-founders and co-Chief Executive Officers of TPG and the sole members of its board of directors. They also have served as co-CEOs and the only two directors of TPI.

TPG has 100 shares of common stock issued and outstanding. Since its inception, Elting has owned 50 shares of TPG common stock, Shawe has owned 49 shares, and Shawe's mother, Shirley Shawe ("Ms. Shawe"), has owned the remaining 1 share. By virtue of Ms. Shawe's one percent ownership, TPG has been able to claim the benefits of being a majority women-owned business.[2]

Although Ms. Shawe holds one share of TPG, Shawe has treated his mother's share as his own property and himself as a 50% co-owner of the Company. In 2014, he held a proxy giving him the "full and complete power to exercise at any time . . . any and all rights to and/or arising from or connected with" her share of TPG,[3] and represented himself to third parties, including the Company's outside domestic payroll administrator, as the "50% owner and Co-CEO" of the Company.[4] In early 2013, he instructed the Company's long-time accountants, Gerber & Co. ("Gerber") to "start the ball rolling … on getting [Ms. Shawe's 1%] back into [his] name."[5] When Gerber expressed concern

---

[2] Trial Tr. ("Tr.") 611-12 (Shawe).

[3] Joint Exhibit ("JX") 531 at TPT_EE_00043819.

[4] JX 687; JX 730.

[5] JX 220. In 2002, Ms. Shawe acquired a 1% interest in the predecessor to the Company. The record does not reflect that Ms. Shawe has played any meaningful role in the Company's business or affairs. I infer that Ms. Shawe obtained her 1% interest from Shawe and that Shawe believed he was entitled to demand its return.

about doing so without telling Elting, Shawe objected strenuously, telling Gerber, "No f***ing way. It's my share," and that it was none of Elting's business, writing, "It's my property."[6] Based on this evidence, and the overall trial record, I find that Shawe and Elting have behaved functionally at all times relevant to this case as if they were 50-50 owners of TPG, *i.e.*, two factions with equal, non-controlling ownership interests.[7]

On September 11, 2009, Shawe and Elting formed Shawe & Elting LLC (the "LLC"). Shawe and Elting each own a 50% interest in the LLC. The LLC has no written operating agreement and has never conducted business operations. Although the LLC appears to have been created to serve as vehicle for asset protection for Shawe and Elting in their capacity as owners of TPG, its sole function since inception has been to receive money from TPG, which occasionally has been distributed to Shawe and Elting for their personal use.[8] No money has ever gone back from the LLC to the Company.[9] As of trial, the LLC held approximately $8 million in liquid assets.[10]

### B. The Founding and Restructuring of the Company

In 1992, Elting and Shawe co-founded the business that is now Company when they lived together in a dormitory room while attending business school at New York

---

[6] JX 221; JX 220.

[7] Elting initially asserted a claim for dissolution in C.A. No. 9700-CB under 8 *Del. C.* § 273. Ms. Shawe's legal ownership of one percent of TPG made that statute inapplicable, and Elting appropriately withdrew that claim. Pre-Trial Stip. ¶ 104.

[8] Tr. 61-63 (Elting); *id.* 1456-1461, 1464 (Stone); JX 335; JX 74.

[9] Stone Dep. 120-21.

[10] Pre-Trial Stip. ¶ 16.

University.  They were engaged in 1996, but Elting ended the relationship in 1997.[11] According to Elting, Shawe did not take the break-up well, and would "terrorize" her and say "horrendous things" about her husband, Michael Burlant, whom she married in 1999.[12]  Despite these tensions, the Company grew from a dorm room start-up to a major player in the global market for translation services.

On June 27, 2007, TPG was incorporated in Delaware as part of a corporate reorganization of various entities.  The reorganization was completed on July 1, 2007. TPG elected to be a Subchapter S corporation.  In general, Subchapter S corporations do not pay federal income taxes.  Instead, the corporation's income or losses are divided among and passed through to its stockholders in proportion to their holdings.  The stockholders must then report the income or loss on their own individual income tax returns.  Distributions from the corporation must be made *pro rata* with the stockholders' ownership interests to preserve the corporation's Subchapter S status.

TPG's bylaws provide that the number of directors constituting the board shall be three, or such larger number as may be fixed from time to time by action of the stockholders of TPG or the board.  The third director seat has remained vacant since

---

[11] Tr. 13 (Elting).

[12] *Id.* 14-15 (Elting).  Elting's testimony on these events gives color to her and Shawe's relationship.  After the break-up, Shawe became very angry and "got under the bed and he stayed there for at least a half hour."  Shawe repeated the same bizarre behavior years later when Elting was in Buenos Aires, Argentina, on business.  Shawe showed up unannounced at Elting's hotel room, refused to leave and again "got under the bed" for about a half hour.  Shawe also oddly invited himself and his mother (Ms. Shawe) to Elting's wedding in Montego Bay, Jamaica.  *Id.* 13-17 (Elting).  Shawe did not deny taking any of these actions.

TPG's organization. Although they made several attempts to do so, discussed below, Shawe and Elting never entered into any written agreements governing the operations of the Company or their relationship as stockholders, such as a buy/sell agreement.

### C. The Company's Operating Structure and Growth

Each of the Company's business lines is run as a separate division or "production center." The employees in these divisions historically have reported to either Shawe or Elting, but not both. Elting leads the document translation and interpretation-service-related divisions, which are sometimes referred to below as "TPT." Shawe leads the divisions offering website and software localization technology services, such as document management and web-based document hosting, which are sometimes referred to below as the "TDC" or "TCM."[13] By number of production divisions, Elting manages five, and Shawe manages eighteen.[14] In terms of revenue, their respective divisions have accounted for roughly equal percentages in 2013 and 2014.[15]

The Company also has non-production departments known as "Shared Services." They include Accounting and Finance, Operations (which includes Legal), Human Resources (HR), Information Technology (IT), Sales, Marketing, and Communications. Shawe and Elting share responsibility for managing Shared Services, meaning that the employees who work in these divisions are supposed to report to both of them.

---

[13] Tr. 547-48 (Shawe); JX 2081.

[14] JX 328.

[15] JX 2125 at 6.

6

The Company has experienced profitable growth every year for over two decades. In 2014, the Company's revenue exceeded $470 million, an all-time high,[16] and its net income totaled $79.8 million.[17] The following table reflects the Company's annual revenues for the years 2008-2014:

| Year | Revenue |
|------|---------|
| 2008 | $199,106,330 |
| 2009 | $220,019,220 |
| 2010 | $251,274,522 |
| 2011 | $300,281,114 |
| 2012 | $341,626,565 |
| 2013 | $401,627,932 |
| 2014 | $471,341,019 |

The Company has no debt.[18]

## D. Early Disagreements Between Shawe and Elting

The trial record of the disputes between Shawe and Elting that led to this litigation begins in earnest in late 2012, but several earlier events provide additional context.

In January 2011, Elting became upset when she learned that some of the Company's American Express membership points had been used to purchase an expensive plane ticket for Shawe's fiancée without Elting's approval or the approval of the Company's former treasurer, Gale Boodram,[19] an employee loyal to Elting who has

---

[16] JX 2189.

[17] JX 2123.

[18] Tr. 32 (Elting).

[19] JX 2014 at EltingCTRL00059746.

7

played a prominent role in many of the disputes between Shawe and Elting.[20]  More generally, Elting was upset by Shawe's recent world travel and his upcoming wedding, which she viewed as "self-indulgent."  This prompted her to raise the subject of being bought out of the Company in a February 3, 2011, email exchange:  "I think your priorities are all wrong now and we're not meant to be business partners.  [Let me know] how much you want to buy me out for—I'd like to make this amicable."[21]

On April 19, 2012, Michael Stone of Gerber sent Shawe and Elting a draft of a stockholders agreement, which included a buy/sell provision.[22]  The same day, Elting became upset when she learned that Shawe had submitted raises for certain employees without her approval.  Shawe believed he had the authority to grant the raises because the employees worked for TDC and related divisions he managed.  Elting disagreed, stating in an email that she and Shawe "both must agree to spend $," and instructing Stone, who was copied on the email chain, to "finalize the buy/sell."[23]  That never happened.

Before 2012, the Company had distributed funds to its three stockholders periodically to cover their respective tax liabilities ("tax distributions") for profits of the

---

[20] On the eve of trial, Shawe learned from HR that there was an ongoing investigation into Boodram's eligibility to work in the United States.  Elting confirmed at trial that she knew of this potential problem, but had not discussed it with Shawe.  Tr. 415-16 (Elting).  After trial, Boodram was terminated from the Company due to issues with her work visa.  Tr. of Oral Arg. 99 (Apr. 28, 2015); Tr. of Oral Arg. 118 (June 3, 2015).

[21] JX 2014 at EltingCTRL00059746.

[22] *See* Tr. 574-75 (Shawe); JX 2147.

[23] JX 2151.

Company that passed through to them by virtue of the Company's status as a Subchapter S corporation, but had made only relatively modest distributions beyond these amounts ("non-tax distributions"). From 2009 to 2011, for example, the total amount of non-tax distributions did not exceed $2.5 million in any year for all stockholders.

In January 2012, at Elting's urging, Shawe agreed to make a non-tax distribution from the LLC totaling $10 million, $5 million each to Shawe and Elting. Elting put her portion of the distribution toward the purchase of a home in the Hamptons.[24]

### E.    Temper Tantrums and "Mutual Hostaging"

On October 9, 2012, a TransPerfect employee wrote to Elting and Shawe, seeking their approval to hire an employee in India. Shawe was fine with the hire if Elting did not object, but Elting was concerned that the office was not meeting its gross margin goals.[25] The disagreement started a heated email exchange in which Shawe and Elting each criticized the other's management performance and each took credit for the Company's success. After Shawe accused Elting of having "checked out for 5 years" to deal with a personal situation, Elting wrote: "If you think I'm so unnecessary and even detrimental I'll take a sabbatical for a year and you'll see what happens. Is that what you want? I'm on the verge. Just tell me."[26]

---

[24] Tr. 64-65, 313-14 (Elting); *id.* 591-92 (Shawe).

[25] JX 158 at ShaweCTRL00010038-24.

[26] *Id.* at ShaweCTRL00010038-23.

The parties' disagreement spilled over into a discussion the next day over whether to open an office in Montpellier, France.[27] When Elting questioned the wisdom of opening this office because of the area's employment laws, Shawe threatened to shut down the entire Company if he did not get his way:

> I know all this, but it doesn't matter…
>
> It's been promised, and I'm opening a tiny office there. … and I've promised that to a 10 year employee.
>
> I CANNOT RUN MY PART OF THE COMPANY THIS WAY … AND HAVE ENOUGH MONEY AND HAVE NO $12 MILLION HOUSE. SO F*** IT.
>
> ALL ACCOUNTS ARE FROZEN.
>
> YOU WANT TO GO NUCLEAR OVER THIS … JUST SEND EVERYONE HOME NOW AND STOP SERVICING THE CLIENT.
>
> MY MISS[I]LE KEY IS TURNED.[28]

Two minutes later, Shawe reiterated the same threat, again copying Gerber's Stone on the email:

> My small TDC office opens…or this whole place shuts down.
>
> I have enough money to live the rest of my life comfortably. I don't have/need $12 million houses so I don't care.
>
> Mike [Stone] – I'm holding all payroll, all checks, and freezing all accounts.[29]

---

[27] JX 159.

[28] *Id.* at EE_00002097.

[29] JX 161 at EE_00011068.

Five minutes later, Shawe sent a third email to Elting and Stone entitled "I'm shutting the company down if you do this...," in which Shawe wrote:

> …let's start letting people know.
>
> I will go live on an island.
>
> I don't care.
>
> FOR YOU TO MAKE ME GO NUCLER OVER A $20k office decision is not one you should take lightly.
>
> Relent on my tdc stuff.
>
> Or I will dismantle this place starting today.[30]

Elting ultimately relented to Shawe's request to open the Montpellier office.[31] Other episodes in the record further demonstrate that the bullying tactics Shawe employed to get his way in opening the Montpellier office have been part of his *modus operandi*.

By late 2012, the disagreements between Shawe and Elting had become weekly, if not daily, occurrences and were characterized by what Shawe described as "mutual hostaging," where Elting would hold things up that Shawe wanted unless she got certain things that she wanted, and vice versa. Shawe acknowledged that mutual hostaging is not "necessarily a healthy way to run the business."[32] The events in November 2012 illustrate the mutual hosting phenomenon endemic to the Company's management.

---

[30] JX 160 at EE_00010030.

[31] Tr. 69-70 (Elting); *id.* 630 (Shawe).

[32] *Id.* 624 (Shawe).

11

On November 19, 2012, Elting informed Stone that she wanted the Company to make a $10 million non-tax distribution to the stockholders.[33] Shawe rejected Elting's request, citing the fact that the Company recently had made a large non-tax distribution, and telling Stone that Elting had been "acting like a lunatic lately."[34] The next day, Elting summarily rejected a proposed acquisition of a company called Rixon, writing, "[D]on't bother."[35]

After the Company's head of sales (Brooke Christian) replied that "the [R]ixon deal is fantastic so please let's not derail that one," Elting changed tactics. Twenty minutes after her first email, she stated, "I like it too and I'd need to manage it."[36] Shawe objected to that suggestion (and ultimately nixed the Rixon deal[37]), prompting Elting to threaten to stop paying the Company's lawyers at Kasowitz Benson Torres & Friedman LLP ("Kasowitz"), which was representing the Company in a patent litigation involving a company called MotionPoint. In a terse email, Elting wrote that Shawe had "2 minutes to decide" on making a profit distribution "immediately" or "the suit is over."[38] Elting was frustrated because the Company had spent "a fortune" on legal fees without her knowing

---

[33] JX 167 at G00055.

[34] *Id.* at G00056.

[35] JX 170 at G00058.

[36] *Id.*

[37] Tr. 296-97 (Elting).

[38] JX 170 at G00057.

12

what was happening in the litigation.[39] Shawe told Stone the next day to "move some money to the LLC" and implored him to "please find a way to stop the double-approvals on everything. It's bad for morale."[40]

On November 27, 2012, Stone reported to Boodram that Shawe and Elting had approved making automatic quarterly profit distributions to the stockholders of $2 million in total each quarter beginning on January 1, 2013.[41] Boodram confirmed the arrangement with Elting but Shawe would not approve it because he believed that Elting was "hostaging" another transaction.[42] In a January 3, 2013, email, Shawe asked Stone to find out "if Liz is blocking" the transaction and admitted to Stone "I'm fine with distributions. She's just being a delusional lunatic lately."[43] No resolution was reached on making regular non-tax distributions.

According to Shawe, he and Elting historically needed to agree on "board-level decisions" such as the declaration of a dividend or a significant merger or acquisition, but each had the authority to make less significant decisions without approval from the other for the business divisions each managed. Shawe asserts that this historical practice,

---

[39] Tr. 299-300 (Elting). MotionPoint sued the Company for patent infringement concerning a technology Shawe considered to be an "important part of [TPG's] future." *Id.* 608 (Shawe). The Company countersued and was awarded about $4 million in damages, but its litigation costs were "upwards of $15 million." Tr. 612-13 (Shawe).

[40] JX 175.

[41] JX 195 at TPT_EE_00044101.

[42] *Id.* at TPT_EE_00044100.

[43] *Id.*

which was not documented, changed around December 2012, when Elting insisted that routine decisions must receive their "dual approval."[44] The dual approval requirement for routine decisions fueled more mutual hostaging and intensified the parties' disagreements in 2013.

## F. More Mutual Hostaging

On February 6, 2013, Elting was asked to approve a bonus for an employee working in one of the divisions (TDC) Shawe managed. Elting was willing to approve the bonus if Shawe approved other "raises that [were] being held up."[45] Intent on eliminating dual approvals, Shawe would not sign off on the raises Elting wanted to implement unless she would agree that "other small TPT/TDC decisions go through with *either* partner's approval…to avoid hostaging and eventual nuclear war."[46] Elting would not agree: "No, Phil. Not how it works here . . . the arrangement is to share it all with both of us. If there is good justification and transparency I will never hold things up."[47] Shawe would not relent. He instructed Boodram not to release any of the raises: "They will remain hostaged… until we figure out how to make decisions in general without

---

[44] Tr. 659 (Shawe); *see also id.* 1328 (Sank); *id.* 1389 (Stone).

[45] JX 203.

[46] *Id.*

[47] *Id.*

14

hostaging."[48]   The episode was played out in an email string on which many of the

Company's senior managers were copied.

In an email exchange on February 14, 2013, Shawe put a new hire for one of

Elting's divisions (TPT) "[o]n hold" to pressure Elting to abandon dual approvals.[49]

Kevin Obarski, Senior Vice President of Sales, who was copied on the email string,

chimed in with a private email to Shawe telling him that he was acting like a child:

> You told me in New Orleans that I should tell Liz when she is being crazy-
> This is me telling you that you are being crazy.  I know you are going
> through a tough time- but you are acting like a child, ruining the rep that
> you have spent two decade[s] to build and all for what.  Because you need
> to run things by people.  It is wasting your own and everyone's time- just so
> you can be right.  Who cares about being right.  We are about to change the
> world and you are wasting your energy and time on something that does not
> matter.[50]

In his private response to Obarski, Shawe revealed his plan to "create constant pain" for

Elting until she acquiesced to his demands.  He wrote, in relevant part:

> I will not run small things by anyone for my divisions.  I will make
> decisions for my division…and I will hold up Liz's TPT stuff till they are
> pushed through.
>
> I cannot fight on every small decision.  I cannot and will not live that way.
> I will not change my position.  I will simply create constant pain until we
> go back to the old way of doing things…[51]

---

[48] *Id.*

[49] JX 217 at TPT_EE_00044011.

[50] *Id.* at TPT_EE_00044010.  In contrast to the candor Obarski expressed in his contemporaneous emails, I found his testimony at trial not to be credible.  Obarski's testimony was rehearsed, belligerent, and calculated to serve as a cheerleader for Shawe rather than to provide straight answers.

[51] *Id.*

In mid-March 2013, Shawe and Elting were at loggerheads again over their respective lists of demands. Shawe wanted to make certain hires and to pay the Kasowitz lawyers for the MotionPoint litigation. Elting would not agree unless Shawe approved an immediate profit distribution.[52] On March 14, 2013, the two exchanged proposals for a longer term agreement on profit distributions, but were unable to reach a compromise.[53]

## G. The April 2013 Tax Distribution Controversy

Before April 2013, the Company, with Shawe's and Elting's mutual consent, routinely made tax distributions to cover the stockholders' tax liabilities as a result of TPG's status as a Subchapter S corporation.[54] In April 2013, Shawe and Elting's combined tax liability was an unprecedented $21 million due to the Company's strong performance. Despite the Company's historical practice of paying tax distributions, Shawe refused to authorize the payment of the full $21 million from the Company,

---

[52] JX 227; JX 233 at BoodramCTRL00063126; JX 2340 at BoodramCTRL00063020.

[53] Elting had proposed either to withdraw anything in excess of $30 million in cash on the Company's books on the first of each month, or to take out a specific amount on the first day of each quarter based on a certain level of EBITDA, with the parties agreeing to $2 million per quarter until the EBITDA level could be agreed on. JX 245 at ShaweCTRL00047706-4. Shawe countered with a willingness to distribute $2 million per quarter automatically but conditioned on the elimination of dual approvals. *Id.* at ShaweCTRL00047706-2.

[54] Tr. 77 (Elting); *id.* 1035, 1109 (Shawe); *id.* 1482 (Stone).

demanding instead that $8 million of that amount be paid out of funds from the LLC.[55]

An ugly episode ensued.

On April 9, 2013, Elting threatened to fire a Finance employee (Lora Trujillo) for refusing to make an internal transfer so that the Company would have sufficient funds to pay the full $21 million.[56]   Later, Boodram hovered over the shoulder of another employee (Jasmina Pasic) to force her to complete an internal transfer using the password of a third employee (Fiona Asmah).[57]  With the funds transferred to TPG, Boodram cut checks to cover the tax liabilities of each of the three stockholders.[58]   Shawe later contacted the Company's bank, Signature Bank, and told them to "let the tax checks be cashed when they come in."[59]

In the wake of the tax distribution controversy, Stone emailed Shawe on April 23, reporting that Elting again wanted to get a buy/sell agreement in place.  Shawe replied, "I don't care what Liz wants.  She's made it her mission to make my life miserable.  We can pick this conversation up in 30 days."[60]

---

[55] JX 280; Tr. 1029-31 (Shawe).  As of the end of March 2013, the LLC had slightly more than $8.1 million in assets, almost all of which was held in a money market fund. JX 2055.

[56] JX 274.  Lora Trujillo is the wife of Roy Trujillo, the Company's COO.

[57] JX 274; JX 710; Asmah Dep. 158-61; Tr. 75-77, 81-83 (Elting); *id.* 1394-95 (Stone).

[58] Tr. 82-83 (Elting).

[59] JX 288; Tr. 1038 (Shawe).

[60] JX 293.

17

## H.     Further Disputes and a Failed Compromise

On August 7, 2013, a Vice President of Production (Jin Lee) asked Shawe and Elting to approve annual raises for certain employees in TPT, a division overseen by Elting.[61] Shawe refused to approve the raises until "all [his] stuff is approved,"[62] which included raises for employees in the divisions he managed, a new hire, a new phantom stock plan, a $2 million acquisition of a company called Vasont, and the elimination of dual approvals.[63] Elting would not agree, stating that decisions need to be made "one at a time" and that she would not "approve things in a group that [she was] not clear on."[64] When Shawe continued to withhold approval of the raises she wanted, Elting privately instructed Boodram to proceed with them anyway and threatened to fire Shawe's brother (Larry Shawe) and another employee if Shawe "tries to get in the way."[65]

On August 8, 2013, Shawe refused to approve a promotion for an employee that Elting had approved, commenting that the Company has a "freeze on all offers, hires, raises, bonuses, change form etc."[66] Shawe also refused to approve a $2 million non-tax distribution for the third quarter of 2013 that Stone was recommending, stating:  "Are

---

[61] JX 312; Tr. 374 (Elting).

[62] JX 312.

[63] JX 311.

[64] *Id.*

[65] *Id.*

[66] JX 314 at EE_00003570.

you f***ing [k]idding me??? …you are on all these emails. Everything is frozen until Liz relents on the dual approvals."[67]

On August 15, 2013, Shawe instructed Boodram, the Company's point person in dealing with its outside payroll administrator, Automatic Data Processing, Inc. (ADP), "to make sure no TPT (or any) raises are put through" until she had received written confirmation from him that items for his divisions (TDC and TDM) had been addressed.[68] In the same email string, Shawe accused Boodram of "showing favoritism to one partner [Elting] over the other [Shawe]" because he believed Boodram had removed his access to the ADP payroll system.[69] After confirming that she had removed the access for both Shawe and Elting, Boodram expressed her exasperation at being "bullied" by Shawe, writing: "I think I'll take tomorrow off to seek professional help as I do not know what to do any more. How could we not pay these employees, I just don't know. I can't come to work next week when Liz is not her[e] and not pay these employees. You'll kill me for sure."[70]

Despite the preceding months of tension, Shawe and Elting seemed to have a breakthrough in mid-August. On August 16, 2013, they signed in the presence of a notary (Robert DeNoia, the Company's Vice President of Human Resources) a one-page

---

[67] JX 315.

[68] JX 325.

[69] *Id.*

[70] *Id.*

document setting out in bullet points a compromise that was intended to resolve many of their differences (the "August Agreement"). The first bullet was the key compromise: in exchange for eliminating dual approvals for employees in the divisions they separately managed, "regular normal course of Business Quarterly Distributions" were to be paid, although the amounts were not specified.[71] The August Agreement listed the divisions each would manage, reflected an agreement not to use "an acquisition to retaliate against the other," and addressed what decisions would continue to require dual approval, such as joint reporting divisions (*i.e.*, Shared Services), hires over $150,000 in salary, new leases, and new offices.

The August Agreement provided that Shawe and Elting would review its terms in January 2014. That never happened, and the parties promptly disregarded its terms.[72]

## I.    The Avengers Meeting

Each year, the Company brought together ten or twelve of its most senior executives to discuss initiatives for the next year.[73] Starting in 2012, these annual gatherings were called "Avengers" meetings because each of the executives was nicknamed after one of the fictional superheroes in Marvel Comics' *The Avengers* series.

---

[71] JX 328.

[72] Shawe and Elting each asserted claims against the other for breach of the August Agreement. After trial, the parties dropped these claims. Stip. and Scheduling Order ¶ 3 (Apr. 22, 2015).

[73] Tr. 95-96 (Elting); *id.* 824 (Shawe).

Shawe scheduled the 2013 Avengers meeting to be held in San Francisco, beginning on Sunday, September 8 at 10:30 a.m., and continuing until Tuesday, September 10.[74]

On August 21, 2013, Obarski (who is based in Atlanta) emailed Shawe and asked to delay the start time for a few hours because he needed to take care of his kids that weekend.[75] Shawe responded by threatening Obarski with a $100,000 "fine" if he was late.[76] When Obarski protested and copied another employee on his email response, Shawe replied by fining Obarski $10,000 for "[b]ringing someone else into this conversation" and added Boodram, the Company's payroll manager, to the email string.[77] Shawe later agreed to postpone the start time of the meeting until noon to accommodate Obarski. Shawe described this and related emails as "bickering,"[78] and Obarski minimized the incident at trial.[79] But, the tenor of the emails, Shawe's inclusion of Boodram (whom he despised) in the email string, and the fact that Shawe later berated Boodram for not processing the $10,000 fine[80] all suggest he was serious about "fining"

---

[74] *Id.* 825 (Shawe).

[75] JX 332 at TPT_EE_00043916.

[76] *Id.* at TPT_EE_00043915.

[77] JX 333 at TPT_EE_00043925.

[78] Tr. 834 (Shawe); *see also* JX 336 at TPT_EE_00044872.

[79] When asked whether this was "a significant event in [his] career," Obarski responded, "Not at all. I call it Monday. That's just the way we talk to each other." Tr. 1164 (Obarski).

[80] JX 349 at TPT_EE_00045063; Tr. 834-839 (Shawe).

Obarski for this amount or was using the incident as a pretext to gratuitously harass Boodram.

Although Shawe was willing to accommodate Obarski's schedule for the Avengers meeting, he refused to accommodate Elting's. Before Shawe scheduled the meeting, Elting told him that she could not attend in San Francisco on the proposed dates and asked that the meeting either be moved to New York or be rescheduled.[81] Shawe peremptorily refused, saying "I don't care. We're doing it."[82]

On September 4, 2013, four days before the Avengers meeting was to begin, Elting told a Vice President of Production (Kristyna Marrero) that the location of the meeting was "not approved" and to cancel the plane tickets.[83] After learning that most of the tickets were non-refundable, Elting demanded that Shawe pay for new tickets personally and threatened that if the meeting proceeded as scheduled, "there will never be another merger."[84] The meeting ended up going forward in San Francisco, with Elting participating by videoconference.[85] As a result of the Avengers meeting incident, Elting told other executives that she was putting a freeze on the Company's mergers and acquisitions activity.[86]

---

[81] JX 339 at TPT_EE_00048574.

[82] Tr. 95-96 (Elting).

[83] JX 338 at TPT_EE_00049235.

[84] *Id.*

[85] Tr. 383 (Elting).

[86] JX 340 at TPT_EE_00047859; JX 345 at TPT_EE_00048893; Tr. 1312-16 (Sank).

### J. Senior Executives Recognize the Harm from the Shawe-Elting Feud

In the aftermath of the Avengers meeting, senior members of the Company acknowledged the harm the constant feuding between Shawe and Elting was causing the Company. On September 30, 2013, the Company's Chief Information Officer (Yu-Kai Ng) suggested that one of the Company's goals coming out of the Avengers meeting should be to end the feud: "Love Triangle – Liz / Phil / Company – stop the love / hate relationship – finding a way to work together without negatively impacting everyone else."[87] Obarski agreed, calling it the "biggest business issue we face," as did Michael Sank, Vice President of Corporate Development, who wrote, "[I]t's so obviously the biggest problem the company faces."[88] But Obarksi and Sank expressed seemingly genuine concern that Shawe would "fine" them for bringing up the subject.[89] Obarski had earlier told Elting that the only way to solve the feud was for Shawe and Elting "to agree to someone that is neutral to mediate it."[90]

### K. Shawe Goes After Boodram Again

Around the time Obarski and Sank were discussing the importance of ending the Shawe-Elting feud, Shawe was continuing to do battle with Boodram, whom he viewed

---

[87] JX 363 at EE_00001195.

[88] *Id.* at EE_00001188.

[89] *Id.* at EE_00001189.

[90] JX 355 at TPT_EE_00048614.

as Elting's "puppet."[91]  On September 30, 2013, Shawe wrote that he and Elting "were unable to work out a plan" concerning her role in the Company's payroll and finances and that she was "not to execute anything (i.e. sign any checks or contracts) on behalf of the company" until they did.[92]  Responding to Shawe's directive, Elting told Sank and Thomas Pennell, a consultant who helped the Company with acquisitions, "Acquisitions will never happen.  He is the most sick and evil person I've ever met."[93]

On October 3, 2013, Shawe threatened to terminate Boodram's employment if she sent out a wire transfer to make a distribution to the stockholders without his consent.[94] Saying she could not take Shawe's treatment anymore, Boodram expressed a desire to "take [her] bag and go," prompting Shawe to "accept" her resignation even though she had not actually resigned.[95]  Elting retaliated by terminating the employment of the Company's Chief Operating Officer (Roy Trujillo) who she claimed had interfered with the wire transfter.[96]  Elting also purported to veto an acquisition of Vasont, which Shawe had committed the Company to acquire without consulting Elting and which was set to close the following week.[97]  Despite the threats and counter-threats, Boodram and

---

[91] JX 341 at ELTING_00001220.

[92] JX 352.

[93] JX 354 at ShaweCTRL00010045.

[94] JX 361 at ELTING_00000449.

[95] *Id.*

[96] *Id.* at ELTING_00000448.

[97] JX 362 at TPT_EE_00043324; Tr. 100-01 (Elting).

Trujillo were not terminated from their positions, and the Company eventually acquired Vasont, which Elting manages.[98]

### L. Elting Hires Kramer Levin

On October 8, 2013, shortly before the Vasont acquisition was supposed to close, Shawe asked Elting to approve the transaction "so . . . we can move forward."[99] The next day, Elting told Shawe that "before moving ahead with any further acquisitions," they would "need to have a more productive way of interacting and managing the company."[100] Elting suggested that Shawe "retain a corporate lawyer and have him call" Scott Rosenblum, a corporate lawyer from Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") she had retained to help her "resolve the problems with Phil."[101] Shawe promptly forwarded Elting's email to Obarski and Christian, belittling her proposal as "her latest tantrum."[102] Obarski told Shawe he thought Elting's suggestion was reasonable; Christian chimed in that Shawe had "brought it to this point."[103] Shawe told them both that the idea was "batsh*t crazy" and became enraged.[104]

---

[98] Tr. 652, 679 (Shawe).

[99] JX 371 at TPT_EE_00043879.

[100] *Id.*

[101] *Id.*; Tr. 101 (Elting).

[102] JX 371 at TPT_EE_00043878.

[103] *Id.*

[104] *Id.*

Just hours after learning that Elting had retained Kramer Levin, Shawe retaliated by informing Cushman & Wakefield, the Company's real estate broker for twenty years, that it could "no longer represent TPT/TDC."[105] It was obvious retaliation because Cushman & Wakefield employed Elting's husband, Michael Burlant, and because the record does not reflect any business justification for Shawe's statement. Shawe warned Burlant that Elting had declared "legal armageddon" against him, and that if Elting "wants to dance in this fashion, she'll have a highly motivated dance partner who is willing to go the distance and beyond."[106] Shortly after sending the notice to Cushman & Wakefield, Shawe told Roy Trujillo to put a lock on Boodram's office, and he told Ng to "pull [Boodram's] email from the last 3 months and give" it to him, and not to discuss his directive "with anyone else."[107] Shawe then instructed Steve Tondera, the Company's Chief Financial Officer—whom Shawe had agreed to terminate two months earlier[108]—to continue to operate in his "current capacity as CFO" and to "have no meetings about transitioning or changing your job responsibilities in any way, that do not involve me."[109]

---

[105] JX 374 at TPT_EE_00044852.

[106] *Id.* at TPT_EE_00044851-52. The senior member on Burlant's team at Cushman & Wakefield, Dale Schlather, would later prevent the firm from hiring the Company as a translations vendor. JX 1201. Schlather testified, "We don't do business with people who terminate us, particularly when we're terminated for lack of cause[.]" Schlather Dep. 90.

[107] JX 373 at TPT_EE_00043886; JX 370.

[108] *See* JX 309 at EE_00000053-54.

[109] JX 365.

26

**M.     Shawe Goes Ballistic Over Boodram—Again**

On October 18, 2013, after learning that Boodram had not transferred payroll responsibility for the TDC and TDM divisions he managed, Shawe told Boodram she was suspended, to remove herself from the Company's property, and to "not sign into any corporate systems until further notice."[110]  A few hours later, he went ballistic, writing to Boodram:

> You knew you were not supposed to do this…and you intentionally f***ing did it!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!
>
> DO YOU UNDERSTAND THIS YOU CRAZY PERSON.
>
> THIS IS MY GODDAMN MONEY, MY COMPANY, AND YOU REPORT HALF TO ME…
>
> Perhaps your shrink will have a position for you, because TransPerfect isn't going to.
>
> This payroll f*** up is the last straw.[111]

This email also was sent to Elting, Gerber's Stone, Tondera (the no-longer-fired CFO) and DeNoia (the Vice President of HR).

DeNoia, described by Elting as "the best head of HR [the Company] ever had,"[112] was "appalled and disgusted" by Shawe's conduct.  He wrote:  "[i]t's out of control at this point – something needs to be done."[113]  Two days later, DeNoia amplified on his

---

[110] JX 400 at ELTING_00001263-64.

[111] JX 390 at TPT_EE_00045055.

[112] Tr. 217 (Elting).

[113] JX 388 at EE_00003085.

27

frustrations in an email to Shawe, Elting, and everyone else who received Shawe's initial email tirade to Boodram:

> We need to assess how I can legally, morally and professionally continue in my role as VP of HR.
>
> I cannot be complicit in this pervasive and continuous hostile environment where inappropriate behavior impacts the morale, health and well-being of myself and the staff continues. . . .
>
> Therefore we need to address what, if any role I will continue to play and in what capacity, with this organization.[114]

About six months later, DeNoia resigned because, according to Elting, of the "completely toxic" culture of the Company.[115] Shawe and Elting have not agreed on a replacement.

On October 21, 2013, Shawe twice reminded Boodram that she was "officially suspended" and threatened to call the police if she entered the Company's property.[116] This threat prompted Ronald Greenberg, one of Elting's attorneys at Kramer Levin, to send an email to Shawe and a number of other Company employees stating that Shawe's "recent actions concerning Gale Boodram are completely unauthorized and inappropriate" and that Shawe had "no authority unilaterally to discharge or suspend Ms. Boodram or any other senior company employee without Ms. Elting's authorization."[117]

---

[114] JX 394 at EE_00004261-62.

[115] Tr. 41, 217 (Elting); *id.* 981 (Shawe). DeNoia died within months of his resignation and did not testify in connection with this action. *Id.* 218 (Elting).

[116] JX 398 at ELTING_00001247; JX 400 at ELTING_00001263.

[117] JX 402.

The employees copied on the email were instructed to "not make any material changes to their job responsibilities or issue any checks without Ms. Elting's express consent."[118]

Between October 21 and October 28, 2013, Shawe and Stone expressed to Elting their concern that concentrating the payroll authority in a single employee created a risk to the Company – a "single point of failure" as Shawe called it.[119] In November 2013, primary payroll responsibilities for Shawe's divisions were transferred to Fiona Asmah, but Boodram was not removed from the process to Shawe's satisfaction.[120]

## N.    Another Failed Attempt to Resolve the Shawe-Elting Feud

On October 29, 2013, Shawe (accompanied by Mike Stone and Thomas Pennell) met with Elting (accompanied by her advisors from Kramer Levin (Rosenblum and Greenberg) and a financial advisory firm) to seek to resolve their differences.[121] Over the next few weeks, a number of proposals were exchanged,[122] and the parties appeared to be making progress on resolving some of their disputes. Elting approved the Vasont acquisition.[123] Shawe seemed to agree, at least in principle, (i) to enter into a distribution agreement providing for quarterly non-tax distributions of $2 million per quarter if the

---

[118] *Id.*

[119] JX 399; JX 2284 at BoodramCTRL00081569.

[120] Asmah Dep. 35-36; Tr. 972 (Shawe).

[121] Tr. 109-13 (Elting); *see also* JX 438 at KLNF_00000439-41 (discussing on-going issues between Elting and Shawe).

[122] *See* JX 430; JX 432; JX 433; JX 444.

[123] Tr. 116 (Elting); JX 436 at ELTING_00001038.

Company had at least $30 million in working capital, and regular tax distributions with no working capital threshold; (ii) to advance the non-tax distributions for the fourth quarter of 2013 and the first quarter of 2014 while the distribution agreement was negotiated; and (iii) "to work with Liz in good faith to create a more detailed distribution agreement."[124]

The progress was short-lived. Within five weeks, Shawe and Elting were fighting again over day-to-day issues. On December 2, 2013, in response to Elting's desire for the Company to loan Boodram $15,000 for her daughter's wedding (which was the type of accommodation the Company had made for other employees[125]), Shawe told Boodram that he would not be "permitting any TPT money beyond salary to go" to her until her position was restructured.[126] Elting retaliated later in the day by informing Larry Shawe and Steve Tondera that she would not permit "any TPT money beyond salary to go to either" of them until "Phil and I agree on your positions, if any, going forward."[127] Frustrated that Shawe was unwilling to meet "to resolve [their] issues," Elting wrote that, "[i]n the meantime, all acquisitions are on hold, issuance of phantom stock is on hold, [and] an operating agreement is on hold."[128] Elting also refused Roy Trujillo's request that she sign leases for office space in Pune, India and Miami, Florida, and threatened

[124] JX 444 at KLNF_00000661-62.

[125] JX 456 at EE_00001822.

[126] JX 2275 at KLNF_00002115.

[127] *Id.* at KLNF_00002112.

[128] *Id.* at KLNF_00002113.

that, come March 2014, employees in several Shared Services divisions—Accounting, IT and Operations—would not receive raises.[129]

On December 27, 2013, Elting became upset when she discovered that Shawe had purchased holiday gifts for certain employees without informing her and allowing her to sign her name to the gifts.[130] Shawe inflamed the situation by adding people to the email chain, including recipients of the gifts, referring to Elting as "Scrooge Liz," and instructing certain staff members that "they needn't listen to [Elting], or answer questions about [Shawe] to [Elting]."[131] Shawe went on to accuse Elting of "physically assault[ing] [him]."[132] A little over an hour later, Greenberg joined the email string, warning Shawe that his recent misconduct directed at Boodram "must cease immediately."[133] Shawe was surprised to see an email from Greenberg because, one week earlier, he personally went into the Company's email system and arranged to divert Greenberg's emails by using a spam filter.[134] He wrote to Ng: "Did we unblock this criminal?"[135] Ng later provided

---

[129] JX 462.

[130] JX 490 at TPT_EE_00006527.

[131] *Id.* at TPT_EE_00006527-28.

[132] *Id.* at TPT_EE_00006525.

[133] *Id.* at TPT_EE_00006524.

[134] Tr. 983-88 (Shawe).

[135] JX 490 at TPT_EE_00006521.

further instructions to Shawe on how to block Greenberg's email, which Shawe implemented the next day.[136]

On December 29, 2013, Kramer Levin sent Shawe and Stone a draft of a document entitled "Operating Principles for Management of TransPerfect." The draft addressed, among other things, the composition of the Company's board, which decisions would require dual approval, and included the following buy/sell provision: "Shawe or Elting will each have the option of offering the other in writing a price and terms based on which he or she is willing to buy-out the other or be bought out, and the offeree shall . . . elect either to be bought out or to buy out the offeror on such terms."[137]

### O.    Shawe Spies on Elting and Obtains Her Privileged Communications

On December 20, 2013, Shawe instructed Roy Trujillo and another employee to intercept and bring to him Elting's mail, including mail from Kramer Levin and Kidron Corporate Advisors LLC ("Kidron"), a financial advisor Kramer Levin had retained on behalf of Elting.[138] Shawe would later instruct another individual to look up the "[t]ime and date" and "[l]ength of call" for phone calls that Elting made that piqued Shawe's

---

[136] Tr. 989-90 (Shawe); JX 490 at TPT_EE_00006521.

[137] JX 491 at EE_00008196.

[138] JX 472 at TPT_EE_00006567-68. Because Elting required that all her mail, including junk mail, be delivered to her unopened, Shawe instructed Trujillo to bring it all to him before it was distributed, to which Trujillo responded: "We can do that and conveniently have the 'critical' items on top of the stack ;-)" *Id.*; Tr. 963-65 (Shawe).

interest.[139] By the end of December, Shawe's surreptitious monitoring of Elting had expanded to include her private emails, including those with her counsel.

After retaining Kramer Levin in October 2013, Elting established a password-protected, web-based Gmail account to communicate with her lawyers based on their advice. Elting found it to be time-consuming to use a web browser to access her Gmail account. To solve that problem, she reconfigured her office computer at the recommendation of the Company's director of Global Information Technology so that she could access her personal Gmails through the Outlook program on her office computer. Unbeknownst to Elting, the reconfiguration caused her Gmails to be stored automatically in a ".pst" (personal storage table) file on her computer's hard drive.

On the evening of December 31, 2013, when he knew "[w]ith virtual certainty" that Elting would not be in her office, Shawe secretly accessed her locked office on four different occasions using a master key card with the intent to obtain the hard drive from her computer.[140] Having gained this access, Shawe dismantled Elting's computer, removed the hard drive, made a mirror image of it, and reinstalled the hard drive later that night. A log of the key card access reflects that Shawe entered Elting's office on New

---

[139] JX 1361 at PSTXT-0000421.

[140] Tr. 860-63 (Shawe).

33

Year's Eve at 4:29 p.m., 5:34 p.m., 7:22 p.m., and 7:47 p.m.[141] Shawe began reviewing the contents of the hard drive image the next day.[142]

In addition to breaking in to Elting's computer, Shawe arranged to access the hard drive on her office computer remotely. Using the personal identification number he had previously obtained from the back of Elting's computer, he mapped to her hard drive from his computer through the Company's computer network.[143] Shawe accessed Elting's computer in this manner on at least twenty separate occasions from April 3, 2014, to July 23, 2014.[144] At some point, either through reviewing the hard drive image or his remote access snooping (he could not remember precisely when or which method he used), Shawe discovered that there was a .pst file of Elting's Gmails on her hard drive.[145] Thereafter, when Shawe remotely accessed Elting's hard drive, he downloaded a replica of the .pst file of Elting's Gmails (each later .pst file having accumulated more of Elting's Gmails) to thumb drives so he could view Elting's Gmails privately on his laptop, which allowed him to conceal what he was doing.[146] Through these stealthy actions, Shawe gained access to approximately 19,000 of Elting's Gmails, including approximately 12,000 privileged communications with her counsel at Kramer Levin and

[141] JX 1348 at 5.

[142] Tr. 864 (Shawe); Shawe Dep. 68 (Jan. 20, 2015).

[143] Tr. 865-69 (Shawe).

[144] JX 1339 at Interrog. No. 1.

[145] Tr. 864-65 (Shawe).

[146] *Id.* 865-69 (Shawe).

her Delaware counsel in this litigation.[147] Presumably concerned about the nature of Shawe's actions, Sullivan & Cromwell LLP, Shawe's lead litigation counsel in this Court, told him at the outset of its retention in March 2014 not to send information about the substance of Elting's Gmails to anyone at the firm.[148]

A log of the key card access to Elting's office shows that Shawe entered her office ten more times on several different dates in January and February 2014, all between the hours of 11 p.m. and 2 a.m.[149] The same log shows that Nathan Richards, a person Shawe allegedly hired to serve as his personal "paralegal" on April 4, 2014, entered Elting's office at 4:47 a.m. on April 6, 2014.[150] The record does not provide any

---

[147] Elting stopped using her Gmail account to communicate with her counsel in July 2014. The facts concerning Shawe's access to Elting's Gmails are further described in the Court's February 19, 2015, ruling on a motion *in limine*.

[148] Shawe Aff. ¶ 19 (Apr. 3, 2015); *see also* Shane Aff. ¶ 3 (Dec. 5, 2014); Turinsky Dep. 319-22. About two months after hiring Sullivan & Cromwell, Shawe formally retained separate counsel at Frankfurt Kurnit Klein & Selz, P.C. to advise him on various ethical issues, including his use of Elting's Gmails. The Court assumed that a wall had been established between Shawe's merits counsel at Sullivan & Cromwell and his professional responsibility counsel pending the Court's determination whether Shawe could use any of these documents in this case given the circumstances under which Shawe obtained them. That was not the case. Shawe's professional responsibility counsel made privilege determinations concerning Elting's documents unilaterally, without taking the logical step of first consulting with separate counsel Elting had retained at Paul, Weiss, Rifkind, Wharton & Garrison LLP to address the ethical issues arising from Shawe's conduct. I expected, perhaps naïvely, something more from counsel specifically retained to address ethical issues. Shawe's professional responsibility counsel informed the Court that they provided Shawe's merits counsel with access to approximately 3,100 of Elting's Gmails (including some Elting contends were privileged), and that Shawe's merits counsel accessed approximately 300 of them. Tr. of Oral Arg. 155-56 (Feb. 19, 2015).

[149] JX 1348 at 5-6.

[150] Tr. 871 (Shawe); Shane Aff. (Feb. 17, 2015) Ex. H; JX 1348 at 7.

explanation for these bizarre late night visits. Richards, who was previously the Company's Director of Global Marketing and Communications, resigned from this "paralegal" position in January 2015.[151] Richards did not testify at trial, was not deposed, and did not respond to attempts to contact him that were made during the trial.[152]

## P.    Shawe Refuses to Engage in the Annual True-Up Process

In January of each year, Shawe and Elting, with Stone's assistance, engaged in an annual "compensation true up," through which "unagreed-upon" expenses that either of them charged to the Company during the previous year were reconciled.[153] For example, if Shawe charged to the Company a team-building event (such as tickets to a sporting event) and Elting did not agree that it was an appropriate expenditure, it would be treated as an "unagreed-upon" expense and Elting would receive additional compensation in a commensurate amount in the true-up process.[154] This ensured that Shawe and Elting received equivalent compensation from the Company in addition to non-tax distributions *pro rata* with their ownership interests. Historically, Shawe's unagreed-upon expenses exceeded Elting's by a considerable amount, resulting in the payment of additional compensation to Elting.[155]

---

[151] Tr. 605.

[152] *Id.* 597; Letter from Peter B. Ladig (Feb. 28, 2015).

[153] Tr. 48 (Elting); *id.* 1376-77 (Stone).

[154] *Id.* 741 (Shawe).

[155] *Id.* 48 (Elting); JX 73 at EE_00011212-13.

36

From 2000 until 2013, as Shawe was aware and at Stone's recommendation, the true-up process included salary and benefits the Company paid to Elting's personal assistant, Mohanee Jadunath, who has provided care for Elting's children since November 2000.[156] It also included salary and benefits the Company paid to Ms. Shawe and to Shawe's personal assistant, benefits for Shawe's then-fiancée and now wife, and rent paid for Shawe's apartments.[157] According to Stone, the true-up process was not supposed to include personal expenses, but it may have because his role was simply to tally the expenses, not to make judgments about whether particular expenses were proper business expenses.[158]

In late December 2013, Shawe learned that the Company had paid some bills of Kramer Levin.[159] This came about at Stone's recommendation. On October 10, 2013, he told Boodram that the Company should pay certain bills from Kramer Levin and to put copies of them "in the file for [him] when [he comes to the Company] in January" to perform the annual true-up.[160] In total, the Company paid approximately $144,000 to

---

[156] Tr. 36-37, 51-53 (Elting); *id,* 746-47 (Shawe); *see also* Stone Dep. 147.

[157] Tr. 52-53 (Elting); *id.* 746-47 (Shawe); *id.* 1468-69 (Stone); JX 127.

[158] Tr. 1376-77 (Stone).

[159] *Id.* 721 (Shawe).

[160] JX 487; Tr. 1469-70 (Stone). Despite its role as the Company's long-time accountants, Gerber refused to voluntarily produce to Elting documents concerning the past true-ups and, when Elting subpoenaed the firm for these documents, it invoked technical objections so that they would not be produced before trial. *Id.* 1449-50 (Stone); Kaplan Affirmation (Feb. 13, 2015) Ex. 19. Stone of Gerber had a more extensive relationship with Shawe and, by the time of this litigation, was biased for him and against

Kramer Levin and $15,000 to Kidron.[161]   Consistent with Stone's testimony, Elting testified that when Company funds were used to pay Kramer Levin, "the plan was all along to true it up in January, just three months after."[162]   But when the time came in January 2014 to true up expenses for 2013, Shawe refused to allow it to occur, as he would again the following year.[163]

## Q.   Shawe Retains Kasowitz to Represent Him Personally

On January 7, 2014, Shawe informed Elting that he had retained Kasowitz, the Company's long-time outside counsel, to represent him personally in his dispute with Elting.[164]   Elting understandably objected to Kasowitz's simultaneous representation of the Company and one of its stockholders and urged Shawe to retain separate counsel, but Shawe incredibly claimed not to see any conflict.[165]   Among other things, Kasowitz prepared a research memorandum for Shawe regarding whether Elting could successfully

Elting.   Stone is Shawe's personal accountant, was a groomsman at Shawe's wedding, went on numerous trips with Shawe (including to Las Vegas, Mexico, Singapore, Hong Kong, and Thailand) at the Company's expense, assisted Shawe's formulation of offers to buy out Elting, and deferred to Shawe when he was getting conflicting instructions.  Tr. 1420-21, 1443-45, 1470-71 (Stone).   In contrast to its approach to Elting, Gerber produced documents in this action in response to Shawe's subpoena.  *Id.* 1430-31 (Stone).   I have no doubt that, had Shawe wanted the true-up records in Gerber's possession to be available at trial, Gerber would have made them available.

[161] JX 378; JX 477 at BoodramCTRL00104285-86; JX 382 at ShaweCTRL00006804.

[162] Tr. 58 (Elting).

[163] *Id.* 1058-59 (Shawe); *id.* 1470 (Stone); JX 2031 at EE_00001631.

[164] JX 519.

[165] JX 529 at ELTING_00000975.

bring a claim against Shaw for refusing to vote in favor of a profit distribution and whether Elting could dissolve the corporation without Shawe's consent or approval.[166]

On February 13, 2014, an attorney from Kramer Levin, acting on Elting's behalf, told Kasowitz that its relationship with the Company was "under review" given the firm's "failure to address its clear and obvious conflicts of interest," that it may not to take on any new matters for the Company, and that the Company would make no further payments to it until further notice.[167] Kasowitz ignored this instruction and continued to take on work for the Company, without Elting's knowledge or approval, including on a business matter (the hiring of Chris Patten, discussed below) that Elting had expressly not approved.[168] Kasowitz also was also aware that Shawe was reading Elting's Gmail communications with her lawyers and at least one Kasowitz attorney, Daniel Turinsky, read around ten of Elting's Gmails, including some that were communications with Kramer Levin.[169] Kasowitz would personally represent Shawe until January 2015.[170]

---

[166] JX 625. Privilege over this memo was waived because Shawe shared it with a third party, Signature Bank.

[167] JX 567 at EE_00000407. Elting authorized Kasowitz to continue to "work on existing, ongoing matters . . . so as not to prejudice the company." *Id.*

[168] Tr. 119-20 (Elting); JX 954 at EE_00003393.

[169] Turinsky Dep. 313-16.

[170] *Id.* 60-61.

## R. More Employee Frustration and a Counterproposal from Shawe

On February 20, 2014, Sank brought an acquisition opportunity to Shawe and Elting's attention.[171] Shawe was interested in the opportunity, but Elting put the brakes on it, stating "[n]othing happens on any acquisitions until Phil lives up to his end of the bargain on items that were due months ago."[172] Frustrated with "being in the middle" of the disputes between Shawe and Elting, Sank replied: "I realize this may be a naïve statement, but to repeat what I've said many times, there must be some way for you two to resolve whatever is going on . . . without impacting the company."[173]

On February 25, 2014, Shawe, with Kasowitz's assistance, made a carefully drafted counterproposal to the draft Operating Principles he had received from Kramer Levin in late December.[174] In the first sentence of his letter, Shawe stated he did "not believe that we need to change the way we have operated and grown the Company over the last twenty-one years." After outlining a host of specific operational suggestions, Shawe acknowledged that the "turmoil" between Elting and him had "the potential for grievously harming" the business and that if they could not "bridge whatever gap [had]

---

[171] JX 589 at EE_00008914.

[172] *Id.* at EE_00008913.

[173] *Id.* at EE_00008911.

[174] Tr. 775-78 (Shawe).

developed" between them, he was "open to considering a variety of reasonable buy-out options."[175]

## S. Shawe Deceptively "Works Around" Elting

In mid-March 2014, Shawe wanted to hire a new senior level employee, Chris Patten, to address a technology a problem in one of the Company's divisions, TransPerfect Remote Interpreting ("TRI"), which Elting managed.[176] Company representatives had previously met with Patten in 2013 to discuss, with Elting's approval, the possibility of his working for the Company, but Patten rebuffed their advances.[177] Elting opposed the renewed attempt to hire Patten because no progress had been made on the disputes with Shawe,[178] but she later was willing for the Company "to extend an offer to Chris" when she returned from a business trip to Asia if there "no additional crises . . . during [her] absence."[179]

On March 14, 2014, after stating she was in charge of hiring for the TRI division, Elting told Patten in an email (with a blind copy to Shawe) that there would be "no offer

---

[175] JX 3029 at EE_00011072-75. In May 2014, after engaging in mediation, Shawe and Elting exchanged proposals contemplating a buyout of Elting. Tr. 783-85 (Shawe); JX 893; JX 935. Shawe made additional proposals in the midst of this litigation. *See* JX 1189; JX 1312: JX 1338; JX 2003.

[176] Tr. 492-94 (Elting); *id.* 1101-03 (Shawe).

[177] Patten Dep. 29-30; Tr. 1144 (Obarski).

[178] JX 597 at ShaweCTRL00019563-30.

[179] JX 603 at ShaweCTRL00019563-37.

to [him] from the company" until she returned from Asia.[180]  Later that day, Shawe sent

an email—without copying Elting—to Patten, telling him to disregard Elting's email and

offering him a position at the Company.  Shawe then hired Patten unilaterally without

Elting's knowledge by assigning Patten to a different reporting responsibility in the

Company, even though the bulk of Patten's time would be devoted to TRI—and then by

paying Patten personally out of his own pocket.[181]  Even though Kasowitz was working

for Shawe at the time, the firm reviewed the relevant employment agreements on behalf

of the Company.[182]  Shawe also had Patten sign a non-disclosure agreement preventing

him from disclosing the terms of his employment agreement to Elting.[183]  Elting did not

learn that Shawe had hired Patten until July 2014.[184]  As discussed below, Shawe used

similarly deceptive tactics later in the year to work around Elting and unilaterally hire

many other employees.

The Company's practice for giving raises to employees called for the heads of

each department to submit recommendations for employees in his or her department to

Elting and Shawe, who would jointly decide whether or not to approve the

---

[180] JX 601 at EE_00008409.

[181] Tr. 496-97 (Elting); *id.* 1102-04 (Shawe); JX 605.

[182] JX 628 at KBF&T02204.

[183] JX 1072.

[184] Tr. 131, 133-34 (Elting).

recommendations.[185]   When Elting delayed implementation of some of the raises in March 2014, Shawe employed another work around.

On March 19, 2014, while Elting was in Asia, the recommended raises and bonuses for certain Shared Services (IT, Finance, and Accounting) employees were submitted to her for approval.[186]   Elting had questions about the recommendations and was concerned that some of the proposed raises were "not in line with performance."[187] On March 20, Elting told two of the Company's senior IT executives (Yu-Kai Ng and Mark Hagerty) that she wanted to talk through their recommendations when she returned from Asia later in the month.[188]

Upset that Elting was holding up these raises, Shawe instructed a finance manager (Fionah Asmah) to process a "supplemental payroll" through ADP to provide the raises without obtaining Elting's approval.[189]   Upon learning that Boodram was investigating who was responsible for the supplemental payroll and concerned that she may try to reverse it, Shawe, who had been monitoring Boodram's emails, told Ng on March 21, 2014, to "take her out of ADP" and "kill her phone."[190]   In a March 27, 2014, email to Asmah on which the head of HR (DeNoia) was copied, Shawe tried to cover up what had

[185] *Id.* 472 (Elting).

[186] JX 619 at EE_00008068; JX 620 at ELTING_00000467.

[187] Tr. 473-74 (Elting); JX 619 at EE_00008066.

[188] JX 907 at ELTING_00000460.

[189] Tr. 748-52, 1074 (Shawe); JX 735 at TPT_EE_00044190.

[190] JX 638 at TPT_EE_00045006; Tr. 1076-79 (Shawe).

happened, stating falsely that Asmah "had nothing to do" with processing the supplemental payroll.[191]

On March 27, 2014, after returning from Asia, Elting instructed ADP to reverse the raises Shawe had implemented without her approval. She further instructed ADP to remove everyone other than Elting and Boodram from the authorized caller list, leaving only her and Boodram capable of processing a payroll.[192] Two days later, Elting instructed Boodram to reprocess most of the raises.[193] All of the relevant Shared Services employees, other than Asmah, ultimately received those raises, and Ng did not receive a bonus.[194]

### T. The Double Payment of Elting's Taxes in April 2014

Shawe and Elting's estimated taxes for the first quarter of 2014 were due on April 15, 2014. The seemingly simple exercise of arranging for the Company to distribute funds to cover the taxes owed or to pay them directly to the tax authorities for that quarter became yet another point of controversy.

On April 1, 2014, after receiving an email from Gerber suggesting that Roy Trujillo was handling the Company's payment of the first quarter estimated taxes, Elting sent Shawe an email saying, in no uncertain terms, "Roy [Trujillo] is not to handle my

---

[191] JX 667 at TPT_EE_00043179; Tr. 1073-75, 1079-81 (Shawe); *see also* JX 666.

[192] Tr. 480-82, 485-87 (Elting); JX 671.

[193] Tr. 483 (Elting).

[194] JX 802 at ShaweCTRL00001692; JX 1257 at ¶ 4.

taxes or my distributions."[195]   Earlier that day, Elting had the Company send out payments for her estimated taxes, but she waited to inform Shawe that she had done so because she wanted to make sure Shawe did not cancel the checks before they cleared.[196]

On April 3, 2014, at 4:15 p.m., Shawe announced in an email that he was "pleased [to report] that as promised, all of our S-corp taxes are finished and paid."[197]   This prompted Elting to respond at 9:25 p.m. on April 3, that Shawe was "not authorized to pay [her] personal taxes," which she was handling herself.[198]   The tax payments Shawe had arranged were not actually sent out until April 4, 2014.[199]   Consequently, the Company paid Elting's first quarter estimated taxes twice (on April 1 and on April 4) because Shawe and Elting were incapable of behaving rationally to accomplish a simple task.   To prevent the Company's Subchapter S status from being jeopardized by the double payment of Elting's taxes, the Company made corresponding distributions to Shawe and Ms. Shawe in August 2014 to equalize their *pro rata* distributions.[200]

**U.     The Termination of the Company's Public Relations Firm**

Before April 2014, the Company used the public relations firm Metis, Inc. According to Elting, Metis helped generate "terrific press" for the Company in many

---

[195] JX 784 at EE_00001930-31.

[196] Tr. 164-67, 451-59 (Elting); *id.* 1044-45 (Shawe); JX 2031 at EE_00001629; JX 742.

[197] JX 784 at EE_00001930.

[198] *Id.*

[199] *See* Tr. 1046-47 (Shawe).

[200] *Id.* 167-68 (Elting); *id.* 1052 (Shawe).

publications, including *The New York Times*, *The Wall Street Journal* and *Forbes*.[201]  In April, believing Metis was loyal to Elting, Shawe demanded that the firm provide him with Elting's personal password to access the Company's Facebook account.  When Metis declined, Shawe stopped payment of Metis's invoices, after which Metis terminated its relationship with Company.[202]  Shawe and Elting have since been unable to agree on a replacement public relations firm.[203]  According to Elting, Metis's termination has negatively impacted the Company, which received significant negative press in 2014 after Shawe and Elting sued each other.[204]

## V.  The Litigations Begin

It was only a matter of time before the Shawe-Elting feud would make its way to the courthouse.  In May 2014, Shawe and Elting filed four separate lawsuits against each other.

On May 8, 2014, Elting filed an action in the New York Supreme Court (the "New York action") seeking to remove Shawe as a director and officer of TPI, the main operating subsidiary of TPG.[205]  On May 15, 2014, Elting filed a Verified Petition for Dissolution of the LLC in this Court (C.A. No. 9661-CB).  It was preceded by an

---

[201] *Id.* 121-22 (Elting).

[202] *Id.* 122 (Elting).

[203] *Id.* 1108 (Shawe).

[204] *Id.* 125-28 (Elting); JX 1018; JX 1022.

[205] Pre-trial Stip. ¶ 15.

exchange of correspondence in April 2014 in which Shawe refused Elting's request for his written consent to dissolve the LLC under 6 *Del. C.* § 18-801(a)(3).

On May 22, 2014, Shawe filed a Verified Complaint in this Court (C.A. No. 9686-CB) individually and derivatively on behalf of TPG asserting claims against Elting for waste, breach of fiduciary duty, unjust enrichment, breach of contract, and indemnification. The next day, Elting filed a petition in this Court (C.A. No. 9700-CB) that, in its most recent form (the Third Amended and Supplemental Verified Petition for Dissolution and Appointment of a Custodian or Receiver, and Verified Complaint), seeks (i) the appointment of a custodian for TPG under 8 *Del. C.* §226(a)(2) to sell the Company; and (ii) the dissolution of TPG under the Court's equitable powers.[206]

## W.    The Audited Financials Controversy

The Company has never obtained audited financial statements, instead choosing to obtain reviewed financial statements.[207]  Elting asked Shawe at some undefined point to authorize an audit of the Company, but he refused.[208]  Elting testified she wants audited

---

[206] The petition seeking dissolution originally asserted six claims.  Elting later voluntarily withdrew four of them.  Stip. and Scheduling Order ¶ 3 (Apr. 22, 2015) (withdrawing the breach of contract claim asserted in Count IV); Elting's Post-Trial Ans. Br. 32 n.17 (withdrawing the breach of fiduciary duty claims asserted in Counts V-VI); Pre-trial Stip. ¶ 104 (withdrawing the dissolution claim under 8 *Del. C.* § 273 asserted in Count III).

[207] "Reviewed" financial statements are based on an outside auditor's review of the company's statements, including inquiries of company management, but they do not involve an assessment of the company's internal controls or fraud risk.  *See, e.g.*, *Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2010 WL 3314484, at *6 n.77 (Del. Ch. Aug. 2, 2010) (discussing the difference between reviewed and audited financial statements).

[208] Tr. 182-83, 251-53 (Elting).

financial statements in part because the Company's clients have requested them in response to concerns arising from the litigation, and because she and Shawe "will not be able to effectuate a deal" to resolve their disputes without them.[209] Shawe testified that there is no business reason to audit the Company because it is a closely held private corporation, and that the Company would likely not pass an audit unless it first addressed certain internal control problems.[210]

Shawe challenges Elting's contention that the Company's clients want audited financial statements. He asserts that Elting prompted some clients to request them for the ulterior purpose of facilitating her desire for a buy-out. Although Elting denies asking any client to ask for audited financials of the Company,[211] I find it is more likely than not that she did so with respect to Goldman Sachs and Bank of America.

In June 2014, the Company was negotiating a new contract with Goldman Sachs to provide translation services for its Asia business.[212] Goldman Sachs had another role relevant to the Company. In May 2014, it had indicated it was "highly interested" in providing debt financing in connection with a proposal Elting made to acquire the

---

[209] *Id.* 182-83 (Elting).

[210] *Id.* 581-82, 759-61(Shawe).

[211] *Id.* 184-86 (Elting).

[212] *Id.* 227 (Elting).

Shawes' equity interests in the Company.[213]  Mark Segall of Kidron was interacting with an employee of Goldman Sachs (John Waldron) for this purpose.

On June 9, 2014, Waldron forwarded Segall an internal Goldman Sachs email in which a person working on the Asia business contract inquired about the significance of the New York action, which Goldman Sachs discovered in its due diligence.  Segall responded to Waldron that "perhaps we can use this commercial matter with Goldman" (referring to the new Asia business) "as a way to move the ball forward" on a buy/sell process.  He then asked Goldman Sachs to "consider sending Liz an email that we could distribute internally to Phil and our senior managers" saying, in part, that to obtain a commitment letter from Goldman Sachs to facilitate a buy-out:

> [A]n audit must be undertaken covering the last 3 years of consolidated financial statements by a top US accounting firm; and [o]nce Goldman has confidence that the process is moving forward along this path, it can continue with the commercial relationship; until then, there is in fact too much risk to do so.[214]

Segall testified that he "did not sent this out on [his] own,"[215] from which I infer that Elting and/or her legal advisors were involved in that decision.

Elting read Segall's email the day it was sent, did not object to it, and pursued the strategy Segall suggested.[216]  On June 16, 2014, Elting forwarded to Shawe and other

---

[213] JX 935 at EE_00000101.

[214] JX 982 at ELTING_00004451.

[215] Segall Dep. 163.

[216] Tr. 237, 526 (Elting).

senior managers of the Company an email she had received from Goldman Sachs earlier in the day, which she used to press the need for audited financials to reach a "buy/sell resolution": "Goldman is indicating below they will not move forward [with the Asia business] until they see the timing around the resolution."[217]

Elting admits she likely told Bryan Cohen of Bank of America during the summer of 2014 that having audited financial statements would help her resolve her issues with Shawe.[218] Bank of America also was in discussions with Elting about providing financing for a potential transaction.[219] On September 4, 2014, Cohen sent an email to certain employees of the Company (copying Elting) in which he stated, "Bank of America requires audited financials as part of standard vendor management activities to validate vendor financial stability."[220] Although Cohen vigorously denied that Elting asked him to make this request,[221] I discount this testimony because of another email he sent (less twenty minutes earlier) in which he told several TPG employees (without copying Elting) that he would "be sending an email to [them] with a copy to Liz (per her request to help things along with the 'issue') requesting 3 years of audited financials."[222]

---

[217] JX 1019 at Kidron_00001627; Tr. 238-42 (Elting).

[218] Tr. 256-57, 259 (Elting).

[219] *Id.*

[220] JX 1159.

[221] Cohen Dep. 64-65, 76, 210-12.

[222] JX 1160.

Bank of America, like Goldman Sachs, has not received audited financials from TPG because they do not exist.

According to Elting, separate from the audited financial statements issue, Goldman Sachs and Bank of America, along with several other clients, have expressed concern about the state of affairs at the Company. These additional clients include Procter & Gamble, Shell Oil, and numerous law firms.[223] Contemporaneous documents corroborate Elting's testimony, which I credit. Internal Goldman Sachs emails from June 2014 reflect that the firm was concerned about spending time and money negotiating the Asia business contract given the risk there might not be a corporate entity to stand behind the contractual representations and warranties.[224] Emails from Bank of America to the Company reflect that the bank viewed the litigation in June 2014 as a "significant risk" from a vendor management perspective because of the potential "instability within an executive management structure" of the Company.[225]

More recently, on January 15, 2015, a Shell Oil representative wrote to a Company sales representative explaining that Shell Oil "ha[s] been thrown something of a curveball" because it had discovered "some concerning articles in the media relating to some splits in the senior management at Transperfect" and it was "worried around what

---

[223] Tr. 218, 513 (Elting); *id.* 1678-79 (Geller).

[224] JX 982 at ELTING_00004452.

[225] JX 972; JX 974; Cohen Dep. 18-20.

direction this might take."[226]  In forwarding Shell Oil's email to Elting, a Company salesperson emphasized "how important this deal is to our company from the $s of the deal itself, to the much bigger opportunity cost."[227]

The strife within the Company has not been lost on its competition.  The Company's primary competitor, Lionbridge,[228] has portrayed the Shawe/Elting conflicts and resulting lawsuits as calling into question the ability of the Company "to deliver on client contractual obligations, as well as basic financial obligations to employees."[229] The record reflects that, in June 2014, Lionbridge solicited Avis Budget Group, Bank of America, and Morgan Stanley in this manner.[230]  A Company employee stated that this issue "could go down as the largest corporate own goal in history."[231]  In response, the Company sent out a mass email message to many of its clients to "guarantee" that the Company "is healthy as ever and will continue to grow and prosper."[232]

## X.    The London Office Lease

On June 6, 2014, Roy Trujillo informed Shawe and Elting that the Company's "London office will [be] at absolute maximum capacity by the end of the month" and

---

[226] JX 1347.

[227] *Id.*

[228] Tr. 553-54 (Shawe).

[229] JX 970 at BOA000064.

[230] JX 967; JX 970; JX 975.

[231] JX 967 at TPT_EE_00006130.

[232] JX 974 at BOA000104.

52

asked whether, "given the risks related to recent events, . . . the company is willing to enter into an additional lease contract of this magnitude at this time."[233] He reiterated this request on June 10, 2014. The next day, Shawe approved it,[234] while Elting reached out to her legal (Kramer Levin) and financial (Kidron) advisors, suggesting that the request could be used as another point of leverage to obtain a buy/sell agreement: "How should I handle? What about we require a buy sell agreement (for the good of the company) in order to move forward?"[235] That antagonistic course was not pursued. After inspecting the London office space during a visit on June 20, 2014, Elting approved a lease for additional space in the Company's then-current building.[236]

Y.   **Shawe Presses Assault and Battery Charges against Elting**

In early June 2014, Elting instructed Roy Trujillo to deliver checks to Shawe and Ms. Shawe to cover their quarterly tax distributions.[237] When Trujillo attempted to deliver the checks to Shawe on June 10, Shawe told him the distributions were not authorized, even though the Company had more than $50 million in available cash.[238] Later in day, Shawe went to Elting's office to confront her about the approximately

---

[233] JX 993 at Cushman00034765.

[234] *Id.*

[235] *Id.* at Cushman00034764; Tr. 245-47, 249-50 (Elting).

[236] Tr. 250 (Elting).

[237] *Id.* 186-87 (Elting).

[238] JX 995 at EE_00000659; Tr. 186 (Elting).

$445,000 tax distribution paid to her.[239] According to Elting, Shawe would not leave her office despite repeated requests and blocked her from closing the door by putting his foot in it, at which point Elting "tried to move it with [her] foot."[240] Curiously, while his foot was in the door, Shawe called one of his attorneys from Sullivan & Cromwell, rather than focus on resolving the situation at hand (*i.e.*, removing his foot from the door).[241] Elting called DeNoia for help and the situation was eventually defused.[242]

On June 11, 2014, Shawe filed a "Domestic Incident Report" in which he accused Elting of pushing him and kicking him in the ankle the previous day.[243] In a parenthetical at the very end of the report, Shawe identified Elting as his ex-fiancée, even though their engagement ended seventeen years earlier, apparently to ensure that the matter would be treated as a domestic violence incident and require Elting's arrest.[244] Shawe's denial of reporting the incident in this manner to have Elting arrested is not credible.

The police called Elting the next day and told her she was going to be arrested for assault and battery. After Elting's lawyers intervened, the charges were dropped, but Shawe filed a civil tort case against her that remains pending.[245] When discussing with

---

[239] Tr. 187 (Elting); *id.* 993 (Shawe); JX 997 at EE_00001520.

[240] Tr. 187-88 (Elting); JX 997 at EE_00001520.

[241] JX 997 at EE_00001518.

[242] Tr. 188 (Elting).

[243] JX 999.

[244] Tr. 995-96 (Shawe).

[245] *Id.* 189-90 (Elting).

her friend a *New York Post* article about the assault and battery charge, Elting wrote, "It's heartbreaking and surreal. [Shawe's] retaliating big time because I had to pursue legal action and I want out."[246] Elting claimed at trial she meant she wanted "out of a relationship" with Shawe, not that she wanted out of the Company.[247]

On October 20, 2014, Shawe's lawyer in the tort lawsuit sent a letter asking Elting's counsel to advise Elting not to move any "evidence, including items in or in the general vicinity" of her office, until it could be inspected.[248] It makes no sense to inspect the premises of an incident more than four months after the fact. The inspection request was a pretext for Shawe to embarrass Elting as the high-profile litigation in this Court was well underway. The day he received the letter from his counsel, Shawe forwarded it to Elting and nine other employees of the Company, some of whom did not even work in the New York office.[249] Ten days later, Shawe wrote to Elting (copying another group of Company employees) to remind her "to bring the shoes [she was] wearing on 6/10 and make them available for the inspectors."[250]

## Z. Shawe Falsifies Records to Arrange More "Work Arounds"

On August 11, 2014, a member of the linguist accounts payable team (Kai Chu) told Elting that, even though his "staff has some of the best retention rates in this

---

[246] JX 1081 at ELTING_000000011.

[247] Tr. 244-45 (Elting).

[248] JX 1239 at ELTING_0003607.

[249] Tr. 996-99 (Shawe); JX 1239 at ELTING_00003605.

[250] JX 1250 at EE_00010903.

company," his team had lost three people in the last six months due, in part, to "the environment" at the Company. Elaborating, Chu explained:

> Staff is stressed out because we haven't found proper help in many months. They are trying to do the right thing by staying and doing the extra time to pay linguists on time but morale is plummeting because they don't see an end to this. Managers are stressed out because we're dedicating our time trying to walk a line to placate orders [from Shawe and Elting] that are diametrically opposed and mutually exclusive. The same mutually exclusive orders disallow action on my replacement hires – which is directly causing the morale problem.[251]

Chu pleaded to Elting to "please allow HR to hire replacements" for the employees who had left the Company so he could "restore the morale back to what it used to be and restore our company image back to what it used to be."[252] These positions were in one of the Shared Services departments (Accounting) that Shawe and Elting managed jointly and for which both of their approvals was necessary to hire new employees. Citing the fact that procedures had recently been implemented in Accounting without her approval, Elting refused to approve the additional hires unless they reported to her.[253] In a contemporaneous document, Roy Trujillo identified "the ongoing disputes and the stressful environment created by it" as the likely cause of the "mass exodus" in Accounting and Finance.[254]

---

[251] JX 1114 at TPT_EE_00045175.

[252] *Id.*

[253] *Id.* at TPT_EE_00045174.

[254] JX 1111 at ELTING_00002815.

Rather than try to reach a compromise with Elting, Shawe circumvented the need for Elting's approval for these and other new hires in the Shared Services departments by concocting a scheme to falsify records that would create the appearance that employees were being hired for one of the divisions Shawe managed, even though they would actually work for a Shared Services division. Specifically, a number of new employees were presented with and asked to countersign two written offers of employment that were virtually identical except in one critical respect. One of the offer letters falsely stated that the employee would report to a manager in one of the divisions Shawe oversaw. The other offer letter, which reflected the reality, stated that the employee would report to a manager in one of the Shared Services departments.[255] Shawe, who personally signed both versions of the offer letters, admitted to hiring approximately ten employees in this manner.[256] At least one was instructed to avoid Elting in the hallways.[257]

**AA.  Shawe Disparages Elting within the Company and Publicly**

On September 3, 2014, as the various litigations were heating up, Elting sent a litigation hold notice (with a copy to Shawe) to over one hundred of her "TPT Team Members," instructing them "to preserve all materials that may be relevant to any of the pending actions."[258] Shawe used this as an opportunity to gratuitously cast aspersions on

[255] Tr. 1093-1101 (Shawe); JX 1147; JX 1148; JX 1213; JX 1317.

[256] Tr. 1100 (Shawe).

[257] Cao Dep. 35-36.

[258] JX 1146 at EE_00006322.

Elting in front of the employees who report to her by sending a "reply all" to Elting's email, writing, "Liz is absolutely correct. . . . p.s. As an example, I've attached one such document that a Court may find very relevant to our dispute."[259] The attachment was a memorandum on Gerber's letterhead to Shawe from Stone, dated April 4, 2014, explicitly accusing Elting and Boodram of colluding to engage in a variety of financial improprieties.[260] Shawe admitted at trial that he was "not proud" of this email, rationalizing it as "a tit-for-tat attack that I regret."[261]

Shawe was not done. A few days later, on September 8, 2014, he upped the ante in his campaign to disparage Elting, this time by issuing a press release in the Company's name concerning developments in the New York action Elting had filed to dissolve TPI.[262] The press release—entitled "TransPerfect Translations International Announces Major Victory in New York Supreme Court"—was disseminated to three business newswires, posted on the Company's Facebook page, and published in the Business Section of *The New York Times*. It falsely purported to be an official public statement of the Company, even though Elting had not approved the press release; it falsely characterized Elting as a "minority shareholder," even though she owns 50% of the Company; and it falsely attributed to Elting a quotation suggesting she was "extremely

---

[259] *Id.* at EE_00006321.

[260] Tr. 1006-07 (Shawe); JX 768.

[261] Tr. 1007-08 (Shawe).

[262] *Id.* 198-200 (Elting); JX 1172.

58

pleased" with rulings the New York court made—rulings that were adverse to her own claims in that case.[263] I find it entirely not credible that Shawe believed, as he testified under oath, that "this press release was factually accurate when [he] wrote it"; that "the Company could use this positive press"; and that it was "very respectful."[264]

## BB. Elting Impedes the Annual Review of the Company's Financials

Since 2007, the accounting firm Berson & Corrado has conducted an annual review to prepare reviewed financial statements for the Company. Berson & Corrado was designated for this purpose by Signature Bank, which provides a line of credit to the Company. In September 15, 2014, Elting stopped payment on a $10,000 check to Berson & Corrado for its 2014 annual review because it was made without her approval.[265] This action prompted Shawe to file a motion to enjoin Elting from interfering with Berson & Corrado's financial review. On October 3, after the filing of that motion, Elting relented and allowed Berson & Corrado to complete its review.[266]

---

[263] The issuance of this press release prompted Elting's September 15, 2015, motion for a temporary restraining order, which I granted on September 18, 2015, enjoining Shawe from disseminating any statements on behalf of the Company or its subsidiaries without Elting's prior, written consent.

[264] Tr. 1010 (Shawe).

[265] *Id.* 277-80 (Elting); JX 2260 at EE_00003373.

[266] JX 1224. Specifically, Elting took the position that did she did "not object to the Company proceeding with the review (and paying the related costs)," she but wanted "the reviewed financial statements [to] be provided only to Signature Bank and not further disseminated until the parties reach an agreement on such dissemination or the Court enters a decision on the issue." *Id.*

59

## CC. The Parties Stipulate to a Deadlock over Electing Directors

Since its incorporation in 2007, TPG had never held an annual stockholders meeting to elect directors. On September 17, 2014, Elting filed an action (C.A. No. 10141-CB) under 8 *Del. C.* § 211 to compel TPG to hold an annual meeting. TPG's bylaws provide for a three-member board of directors, or a larger number set by action of the stockholders or the board.[267] No such action has ever been taken. Shawe and Elting have served as TPG's only two directors since its incorporation, with the third seat remaining vacant.[268]

To resolve the Section 211 action, the parties stipulated that they were deadlocked on electing directors. TPG's bylaws provide for plurality voting in the election of directors,[269] so it is readily apparent that the Company's evenly split factions (Elting versus Shawe and Ms. Shawe) would not be able to elect successor directors, rendering an annual meeting futile. On December 5, 2014, the stipulation among Elting, Shawe, and Ms. Shawe, quoted below, was entered as an Order of the Court:

> 1.    The Stockholders shall be deemed to have participated in a stockholders meeting for the election of directors of the Company (the "Stockholders Meeting"), at which the Stockholders were so divided that they failed to fill the vacancy on the Board and they also failed to elect successors to directors whose terms have expired (*i.e.*, Shawe and Elting).
>
> 2.    Elting and Shawe therefore currently hold the positions of holdover directors of the Company whose terms have expired, but the Stockholders are so divided that they are unable to elect their successors.

---

[267] JX 936 at Art. II, § 2(a).

[268] Pre-trial Stip. ¶ 10.

[269] JX 936 at Art. I, § 7(a).

3.     The Stockholders agree that any Stockholder may use this Order, and the fact that the Stockholders have consented to this Order in lieu of proceeding with a stockholders' meeting, in support of a claim under 8 *Del. C.* § 226(a)(1), and that no Stockholder shall use the fact that an actual meeting was not convened as a defense to any such claim.[270]

On December 10, 2014, Elting voluntarily dismissed the Section 211 action. The next day, she filed another action (C.A. No. 10449-CB) seeking under 8 *Del. C.* § 226(a)(1) the appointment of a custodian or receiver to act in the best interests of TPG given the stipulated deadlock among the Company's stockholders over the election of directors.

## DD.     Shawe Seats Himself Next to Elting on Plane

On December 2, 2014, Elting boarded a red eye flight to Paris and discovered, to her surprise, that Shawe was seated across the aisle from her. Shawe claimed to have "no idea" she would be on the flight.[271] In truth, Shawe previously learned that Elting would be on the flight and made arrangements to be seated next to her without her knowledge.[272] Elting changed seats. The next day, Shawe sent a text message to several of his allies, stating: "Was next to Liz on the plane to Paris and she switched seats ;)."[273] Two of the recipients of the text message were Nathan Richards and Joe Campbell, both of whom are implicated in events concerning Shawe's alleged spoliation of evidence, which is the subject of a motion for sanctions discussed below.

---

[270] JX 1292 (Stip. and Order (Dec. 5, 2014)) at ¶¶ 1-3.

[271] Tr. 215 (Elting).

[272] *Id.* 1011-13 (Shawe).

[273] JX 3035 at PSTXT-0000567.

I find Shawe's characterization of the incident as an attempt to extend an olive branch not to be credible. He did not deny telling Elting that he had "no idea" she would be on the flight, which was not true, and the smiley-face emoticon at the end of his text message suggests he was amused by yet another opportunity to harass Elting, who Shawe knew full well would not welcome his presence on the flight.

## II. PROCEDURAL HISTORY

On November 18, 2014, at the conclusion of a hearing during which the parties argued three motions,[274] I ordered that the three then-pending cases (C.A. No. 9661-CB, C.A. No. 9686-CB, and C.A. No. 9700-CB) be scheduled for an expedited trial on a consolidated basis. Trial was scheduled to begin on February 23, 2015, by which date a fourth action (C.A. No. 10449-CB) had been filed.

On December 2, 2014, Elting moved for expedited discovery in aid of a motion for sanctions she intended to file based on her discovery, on November 25, 2014, that Shawe had accessed and reviewed her personal Gmail account, containing approximately 19,000 emails. I granted this motion after full briefing and argument on December 11, 2014.

As trial approached, the parties deluged the Court with twelve separate discovery motions and motions *in limine*. I ruled on the discovery motions during a full-day

---

[274] Elting moved for summary judgment to dissolve the LLC and for the appointment of a temporary custodian. Shawe moved to enjoin Elting from interfering with the work of the Company's outside accountants (Berson & Corrado and Gerber) and other relief. Each of these motions was denied for the reasons stated on the record during the November 18 hearing and in a letter decision issued on December 3, 2014. *See generally In re TransPerfect Global, Inc.*, 2014 WL 6810761 (Del. Ch. Dec. 3, 2014).

hearing held on February 11, 2015.  During another full-day hearing held on February 19, 2015, which carried over to the next day, I ruled on the motions *in limine*.

On February 22, 2015, Elting filed a motion for sanctions against Shawe based on the following acts of alleged misconduct by Shawe (the "Sanctions Motion"):

- The covert acquisition of approximately 12,000 privileged communications with or for Elting and her counsel.

- The covert entry into Elting's Company office on numerous occasions, including at least once by Shawe's paralegal (Nathan Richards).

- The spoliation of evidence on Shawe's laptop after the Court had ordered a forensic analysis of it.

- The deletion, with Richards' assistance, of 21,000 files on Shawe's laptop.

- The spoliation of external drives onto which Elting's communications with her lawyers had been downloaded.

- The spoliation of files on Shawe's Company computer.

- The placement of a program on Shawe's laptop to delete and prevent the recovery of certain files.

- The failure to safeguard evidence on Shawe's mobile phone, which allegedly was dropped into a glass of soda on November 24, 2014, and later discarded by Joe Campbell, a project manager at the Company hired by Shawe.[275]

Based on this alleged misconduct, Elting requests the imposition of an order:  (1) appointing a custodian to conduct an auction of the Company, (2) precluding Shawe from participating in the auction as a purchaser, (3) enjoining Shawe from communicating with any third-party bidders except through Delaware counsel, (4) providing Elting with matching rights, (5) enjoining Shawe from disclosing to any third party the contents of

---

[275] Br. in Support of Elting's Motion for Sanctions 3-4.

Elting's privileged Gmail emails and certain other documents, (6) enjoining Shawe from engaging in any business competition with the Company for three years following the sale of the Company, and (7) awarding Elting attorneys' fees and costs associated with opposing Shawe's efforts to use the privileged Gmails.[276]

From February 23, 2015, to March 3, 2015, a consolidated trial occurred over a period of six days to address the claims asserted in the four pending actions.

On March 6, 2015, Shawe filed a motion for monetary sanctions against Elting and Kramer Levin for alleged misconduct that occurred during the deposition of Kramer Levin attorney Ronald Greenberg. This motion will be ruled on separately at a later date.

On March 9, 2015, I entered an Order appointing Robert B. Pincus, a corporate attorney with Skadden, Arps, Slate, Meagher & Flom LLP, as a custodian for the purpose of serving as a mediator to assist Elting and Shawe in negotiating a resolution of their disputes. The Order recited, based on my fresh impressions, that "the evidence at trial demonstrates that Elting and Shawe have been fundamentally divided respecting the management of the affairs of TPG concerning, among other things, capital allocation, the payment of distributions to stockholders to cover their respective tax liabilities arising out of TPG's status as a Subchapter S corporation and out of the profits of TPG, the pursuit of acquisitions, and the hiring and retention of various personnel and advisors."

Post-trial arguments occurred during two full days on April 28, 2015, and June 3, 2015. At the conclusion of the June 3 hearing, I informed the parties that no decision

---

[276] *Id.* at 2.

would be rendered before June 30 to afford them additional time to seek to resolve their disputes through the auspices of the mediator. No resolution was reached by that date.

For the reasons discussed below, I conclude that the evidence presented at trial warrants the appointment of a custodian to sell the Company to resolve the deadlocks between Shawe and Elting. I have reached this conclusion solely based on the evidence presented at trial and not as a form of sanction against Shawe.

The Sanctions Motion raises very serious issues of spoliation and discovery abuse that may warrant shifting to Shawe the entire amount of the attorneys' fees and expenses Elting has incurred in the litigating the actions in this Court. As discussed below, however, I conclude it would not be appropriate to impose as a form of sanction any limitations or conditions on the sale process to be overseen by the custodian.

A significant part of the record relating to the Sanctions Motion consists of affidavits from computer forensic experts and other witnesses. Shawe objects to Elting's reliance on purported facts not admitted at trial to decide the Sanctions Motion. I share this concern and have decided to hold an evidentiary hearing on the issues implicated by the Sanctions Motion before ruling on it. The parties are directed to confer and report back to the Court within ten business days of the date of this opinion with a proposed plan and schedule to present at a hearing live witness testimony and any other evidence relevant to the issues raised by the Sanctions Motion as promptly as practicable.[277]

---

[277] Testimony from Shawe, Richards, Campbell, and the parties' respective forensic experts would be of particular interest to the Court.

## III. LEGAL ANALYSIS – DISSOLUTION OF THE COMPANY

In her Third Amended and Supplemental Verified Petition for Dissolution and Appointment of a Custodian or Receiver (C.A. No. 9700-CB), Elting seeks a custodian under 8 *Del. C.* § 226(a)(2) to resolve board-level deadlock by selling the Company (Count I) and dissolution of the Company under the Court's equitable powers (Count II). In her Petition for Appointment of a Custodian or Receiver (C.A. No. 10449-CB), Elting seeks a custodian to resolve stockholder-level deadlock by acting in the best interests of the Company and its stockholders (Count I). I first address the two claims asserted under Section 226(a) before analyzing the equitable dissolution claim.

### A. The Requirements of Section 226(a)(1) have been Satisfied

Under Section 226(a)(1), the Court may appoint a custodian for a solvent corporation when "[a]t any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have been expired or would have expired upon qualification of their successors."[278] This statutory provision does not require a showing of irreparable injury as a prerequisite to obtaining relief.[279] The requirements of this statute plainly have been met.

TPG's bylaws provide for a three-member board. Shawe and Elting have served as TPG's only two directors since it was formed in 2007, with the third seat remaining vacant. On September 17, 2014, in accordance with her statutory right as a stockholder

---

[278] 8 *Del. C.* § 226(a)(1).

[279] *See Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982).

of TPG, Elting filed an action under 8 *Del. C.* §211 to hold an annual meeting for the purpose of electing directors of TPG for the first time in its history. On December 5, 2014, in lieu of holding the annual meeting, the stockholders of TPG stipulated that they "were so divided that they failed to fill the vacancy on the Board and they also failed to elect successors to directors whose terms have expired (*i.e.*, Shawe and Elting)."[280] The stipulation was entered as an Order of the Court on December 5, 2014.

Even when the requirements of Section 226(a)(1) have been satisfied, the appointment of a custodian under that section is discretionary.[281] I address the issue of relief below in Section III.C.

### B. The Requirements of Section 226(a)(2) have been Satisfied

Under Section 226(a)(2), the Court may appoint a custodian for a solvent corporation when:

> The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division.[282]

---

[280] JX 1292.

[281] *See Giuricich*, 449 A.2d at 240 (holding it was an abuse of discretion to deny the petition for appointment of a custodian under Section 226(a)(1) where stockholder deadlock was conceded); *Miller v. Miller*, 2009 WL 554920, at *4 (Del. Ch. Feb. 10, 2009).

[282] 8 *Del. C.* § 226(a)(2).

In *Hoban v. Dardanella Electric Corp.*,[283] the Court explained that Section 226(a)(2) sets forth three conditions before this Court may exercise its authority under the statute. First, the directors must be deadlocked; that is, they must be "so divided respecting the management of the affairs of the corporation that the vote required for curative action by the board as a governing body cannot be obtained." Second, "the business of the corporation must either be suffering or be threatened with irreparable injury" because of the deadlock. Third, "circumstances must be such that the shareholders are unable by shareholder vote to terminate the division between the directors."[284] I address the three conditions in turn.

### 1. The Existence of Deadlocks

In my opinion, Shawe and Elting are deadlocked on several matters of critical importance to the Company. To begin, the record shows that they have been unable to agree for an extended period on the issue of distributions, particularly non-tax distributions.[285] Since 2012, Elting has desired to increase the amount of non-tax distributions as the Company's profits have increased. She believes there should be regular, quarterly non-tax distributions, subject to specified levels of EBITDA or some

---

[283] 1984 WL 8221 (Del. Ch. June 12, 1984).

[284] *Id.* at *1.

[285] The Company generally has made distributions to cover the stockholders' respective tax liabilities for the income passed through to them. But even that seemingly simple task has caused controversy. In April 2013, Shawe and Elting disagreed vehemently over Shawe's desire to pay $8 million of the $21 million due in taxes from funds in the LLC, and, in April 2014, Shawe caused the Company to double pay Elting's taxes, putting at risk the Company's Subchapter S status.

other performance metric. Despite repeatedly saying he is willing to work something out, Shawe has refused to actually agree to anything. The absence of any agreement governing distributions means that Shawe can continue, as he has done in the past, to use the need for his consent to make a distribution as a club to exert leverage over Elting as part of the destructive culture of "mutual hostaging" that has characterized their relationship over the past several years as the only two directors and co-CEOs of the Company.[286]

Related to their deadlock on distributions, Shawe and Elting are equally divided on the Company's pursuit of acquisitions and the need to conduct expense true-ups. Shawe believes acquisitions are critical to the Company's success. Elting is opposed to acquisitions because she does not trust Shawe and does not want to increase her investment with him. Although blanket opposition to acquisitions does not comport with

---

[286] Shawe seeks to claim the high ground by casting Elting's desire for larger distributions as one motivated solely by self-interest, while asserting that he is pure of heart because he wants the Company to retain earnings. It is a legitimate matter of corporate concern, however, for directors to return capital to stockholders in the form of *pro rata* distributions. *See, e.g., Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 722 (Del. 1971) (concluding that there was no self-dealing where the company's controlling stockholder and minority stockholders received dividends *pro rata*). The need to thoughtfully make distributions is particularly important in a closely held corporation where the salaries of the principals holding 99% of the Company's stock are relatively modest and distributions are expected to account for a significant component of their effective compensation. Elting, the co-founder and co-CEO of the Company, earns a salary of $375,000, which is a small fraction of what the Company pays a senior sales executive, and the amount of non-tax distributions she received in 2014 for her 50% interest in the Company constituted less than 1.5% of the Company's net profits that year. JX 2123.

a director's obligation to act in the best interests of the corporation as a general matter,[287] Elting's distrust of Shawe is understandable and strikes at the heart of the palpable dysfunction that exists in the governance of the Company. The record shows, for example, that:

- Shawe engaged in a secret campaign to spy on Elting and invade her privacy by intercepting her mail, monitoring her phone calls, accessing her emails (including thousands of privileged communications with her counsel), and entering her locked office without permission on numerous occasions as well as sending his so-called "paralegal" there at 4:47 a.m. on another occasion.[288]

- Shawe co-opted the services of Company advisors (*e.g.*, Gerber and Kasowitz) to assist him in advancing his personal agenda against Elting.

- Shawe unilaterally hired numerous employees to perform Shared Services functions (Accounting and Finance) and even to work in divisions Elting managed (Chris Patten in TRI) without her knowledge or consent by creating "off book" arrangements and fabricating documents.

- Shawe sought to have Elting criminally prosecuted by referring to her as his ex-fiancée seventeen years after the fact when filing a "Domestic Incident Report" as a result of a seemingly minor altercation in her office.

- Shawe disparaged Elting and tried to marginalize her within the Company by gratuitously disseminating a memorandum (on Gerber's letterhead) to employees in her own division accusing her of collusion and financial improprieties.

- Shawe disparaged Elting publicly by unilaterally issuing a press release in the Company's name containing false and misleading statements.

---

[287] *See, e.g., McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) (observing that directors must exercise "informed business judgment" in evaluating business opportunities available to the corporation).

[288] I reject as an after the fact rationalization Shawe's assertion that he was looking out for the Company's interests in taking these actions. I find to the contrary that Shawe became enraged when Elting engaged counsel to assist her and that he spied on Elting to gain intelligence in pursuit of a personal vendetta against her.

Amazingly, many of these incidents occurred during this litigation when one would expect Shawe to be on his best behavior. In short, Elting's distrust of Shawe is justified.

Since January 2014, Shawe has prevented true-ups that the Company historically performed to reconcile Shawe's and Elting's respective use of Company funds to pay for various expenses. Elting wants to complete the true-up to resolve the controversy over the fees the Company paid (at Stone's suggestion) to her advisors in late 2013, and to determine if she is owed additional compensation if Shawe's expenses exceeded her own, as historically had been the case. They are deadlocked on this issue, as they are on whether the Company should undertake an audit now to obtain audited financial statements.

Shawe and Elting also are fundamentally divided on a series of issues relating to the hiring and retention of various personnel and advisors. Elting wants to terminate Gerber because she does not trust Stone (who has displayed a bias towards Shawe and against Elting) and because she believes the Company needs a top accounting firm. Shawe has refused. Elting wants to terminate four senior executives in Shared Services departments (the COO, CFO, CIO, and CTO) who she believes have aligned themselves with Shawe and have been insubordinate to her as the Company's co-CEO. Shawe has refused. As of trial, the two had been unable to agree on a replacement for the former head of Human Resources (DeNoia), who left the Company about one year earlier, or on a replacement PR firm since Metis was terminated in April 2014.

I reject Shawe's defense that Elting has manufactured the deadlocks described above simply to facilitate a sale of the Company and liquidate her interest in it.[289] The record does show that Elting has expressed a desire to be bought out and acted improperly at times to pursue that goal.[290] It also shows that she and Shawe both engaged in "mutual hostaging" over specific hiring decisions, employee compensation, outside counsel payments, office leases, acquisition candidates, and other matters (mostly routine in nature) as they each sought to advance their own agendas within the Company. That said, this is not a case where a director has "sought to create a deadlock by refusing to consider any issue" until the deadlock is resolved.[291] It cannot be legitimately disputed in my judgment that the matters discussed above reflect genuine, good faith divisions between Shawe and Elting of a fundamental and systemic nature over how the Company should be managed.

### 2. Harm to the Business

The second condition of Section 226(a)(2) asks whether "the business of the corporation is suffering or is threatened with irreparable injury" because of the divisions between the directors. This is a closer question than the existence of the deadlocks

---

[289] Shawe's Post-Trial Ans. Br. 32.

[290] Elting played a role, for example, in exploiting concerns that Goldman Sachs and Bank of America had expressed about the divisions within the Company to prompt them to request audited financials.

[291] *See Millien v. Popescu*, 2014 WL 656651, at *2 n.17 (Del. Ch. Feb. 19, 2014) (positing that such actions are "not the type of conduct that should support the appointment of a custodian" under 8 *Del. C.* § 226(a)).

themselves. Shawe argues that the irreparable harm element of the statute requires that the Company suffer or be threatened with irreparable financial harm, which cannot be established because the Company has been highly profitable.[292]

It is true the Company has been highly profitable. It stands to reason it would be more profitable but for the systemic dysfunction that exists between its two directors and co-CEOs, but that form of inquiry is speculative. In any event, the fact that the Company has been profitable is not dispositive. Section 226 contemplates that a custodian may be appointed for solvent corporations,[293] and logic suggests that the business of even a profitable corporation may be suffering or may be *threatened* with "irreparable injury" in the traditional sense of that legal principle when the directors are so fundamentally divided respecting the management of the corporation's affairs that they are unable to govern. Indeed, Shawe himself acknowledged "the potential for grievously harming" the business that his feud with Elting could cause.[294]

The "irreparable injury" standard was added to Section 226 in 1967 when the Delaware General Corporation Law underwent a major revision. In his classic commentary on the revision, Professor Folk, the reporter for the commission overseeing

---

[292] Shawe's Post-Trial Op. Br. 71-78.

[293] Section 226(a) provides, in relevant part, that, "[t]he Court of Chancery … may appoint 1 or more persons to be custodians, and, if the corporation is insolvent, to be receivers[.]" 8 *Del. C.* § 226(a).

[294] JX 3029. Although Shawe objected before trial to the admission of this document under Rule 408 of the Delaware Rules of Evidence, he cited and relied on this document in his opening post-trial brief. Shawe's Post-Trial Op. Br. 56-57. Thus, this objection is waived.

the revision, referred to the "irreparable injury" standard in Section 226 as "a familiar equity principle."[295]  **"**Perhaps the most often articulated formulation of what constitutes irreparable injury is that it consists of harm for which there can be no adequate recompense at law."[296]  Irreparable injury exists "when a later money damage award would involve speculation,"[297] and irreparable harm to a corporation has been found to include harm to a corporation's reputation, goodwill, customer relationships, and employee morale.[298]  Applying these principles, the record establishes that the Company is suffering and is threatened with irreparable harm.

Numerous employees, including many loyal to Shawe, have recognized the harm to employee morale and retention the Shawe/Elting feud has caused and poses to the Company.  For example:

---

[295] Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis* 271-72 (1972) (internal quotations omitted).

[296] Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.02[e] at 12-30 (2014) (citing, *inter alia*, 4 Pomeroy, *A Treatise on Equity Jurisprudence* § 1338)).

[297] *Hollinger Int'l., Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005); *see also Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 264 (Del. Ch. 2013) (finding irreparable harm where damages would be difficult to calculate).

[298] *See, e.g.*, *Kirpat, Inc. v. Del. Alcoholic Beverage Control Comm'n*, 741 A.2d 356, 358 (Del. 1998) (finding irreparable harm found where the company would suffer "loss of its customer base, and loss of its employees"); *Arkema Inc. v. Dow Chem. Co.*, 2010 WL 2334386, at *4 (Del. Ch. May 25, 2010) (finding irreparable harm where an imminent threat to the company's goodwill and reputation existed); *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005) (finding potential lost sales and lost customers sufficient to establish irreparable harm); *Shah v. Shah*, 1986 WL 10918, at *2 (Del. Ch. Sept. 25, 1986) (finding irreparable harm when disruptive management conflicts threatened employee retention).

- Kevin Obarski (Senior Vice President of Sales) called the feud the "biggest business issue" the Company faces,[299] and bemoaned that the "crazy arbitrary stuff" coming out of it was "the number 1 reason people leave to go to work at competitors."[300]

- Michael Sank (Vice President of Corporate Development) agreed: "it's so obviously the biggest problem the company faces."[301]

- Yu-Kai Ng (Chief Information Officer) identified as a Company goal in the wake of the 2013 Avengers meeting the need to find a way for Shawe and Elting to work together "without negatively impacting everyone else."[302]

- Mark Hagerty (Chief Technology Officer) testified that the conflict "hurts company morale" and "is detrimental to the company."[303]

- Robert DeNoia (former Vice President of Human Resources) expressed his frustration with the "pervasive and continuous hostile environment where inappropriate behavior impacts the morale, health and well-being of myself and the staff."[304]

- Roy Trujillo (Chief Operating Officer), in a letter drafted for submission to a special master appointed in the New York action, attributed the "mass exodus" in Accounting and Finance to "the ongoing disputes and stressful environment created by it." He further stated that "[e]mployees are resigning and leaving these departments at unprecedented rates," that "[t]he morale and retention issue will likely spread," and that "[t]he company's reputation is taking a beating, internally and externally."[305]

---

[299] JX 363 at EE_00001188.

[300] JX 337 at TPT_EE_00048565.

[301] JX 363 at EE_00001188.

[302] *Id.* at EE_00001195.

[303] Hagerty Dep. 104-06.

[304] JX 394 at EE_00004261-62.

[305] JX 1111 at TPT_EE)00045174.

- Kai Chu (an Accounting employee), attributed the "plummeting" morale and loss of employees in Accounting to the "diametrically opposed" orders that had been received from Shawe and Elting.[306]

- Fiona Asmah (a Finance employee) testified that the disputes and conflicting directives have caused her and others to feel "caught in the middle," have created an "unhealthy work environment," and have "affected employee morale."[307]

The harm to employee morale has manifested itself in the loss of employees in Shared Services departments (*e.g.*, Accounting and Finance), some of whose positions only could be filled through duplicitous, unilateral actions by Shawe, as well as senior executives (*e.g.*, Robert DeNoia).

On the client front, Elting testified that clients "have expressed major concerns" about the disputes between her and Shawe, including "Business Wire, Procter & Gamble, Shell Oil, Bank of America, Goldman Sachs, and numerous law firms."[308] As discussed

---

[306] JX 1114 at TPT_EE_00045175.

[307] Asmah Dep. 131-36.

[308] Tr. 218 (Elting). After trial, the parties made numerous letter submissions without obtaining leave of Court as required by Court of Chancery Rule 171(a). In one of those submissions, Shawe identifies certain post-trial business developments of the Company, and he requests that I either take judicial notice of them or reopen and supplement the record to admit them into evidence. The most noteworthy developments are that, in March 2015, the Company entered into a new services agreement with Goldman Sachs, and the Company was awarded a services agreement with Shell Oil. Letter from Lisa A. Schmidt (Apr. 21, 2015) Ex. C, Ex. F. I decline to take judicial notice of these developments or to reopen the record. The fact that Goldman Sachs and Shell Oil have decided to continue doing business with the Company does not change my conclusion that the dysfunction that is now endemic to the Company's management threatens the Company with irreparable injury. Indeed, in one of Elting's post-trial submissions, she asserts that the Company did not obtain increased business with another customer (Johnson & Johnson) due to the Shawe/Elting disputes. Letter from Kevin A. Shannon (Apr. 24, 2015) Ex. B.

76

earlier, contemporaneous documents corroborate this testimony and demonstrate that the Company's largest competitor is seeking to exploit the dysfunction between Shawe and Elting to solicit clients away from the Company. Shawe testified that these clients are not bound by exclusive agreements and are free to leave the Company at "any time they want,"[309] and Martha Geller, Vice President of Strategic Accounts in the Company's Enterprise Solutions Group, acknowledged that the disputes have added a level of complexity to maintaining existing clients and adding new clients, in addition to affecting employee morale.[310]

The deadlock concerning acquisitions, the importance of which Shawe emphasized at trial, also threatens harm. From January 2009 through October 2014, businesses acquired by the Company accounted for between 16.5% and 20% of the Company's annual revenue and between 8% and 14% of its annual net profit.[311] As of trial, however, Shawe and Elting had not agreed on an acquisition since the Vasont transaction in late 2013. It would be speculative to attempt to quantify the harm the business may be suffering from failing to engage in acquisitions, but by Shawe's own admission the deadlock on this issue is a harmful threat to the Company.

In sum, although it is true that the Company is and has been a profitable enterprise to date, its governance structure is irretrievably dysfunctional. The Company already has

---

[309] Tr. 771 (Shawe).

[310] *Id.* 1679 (Geller).

[311] JX 2210 at HOF0001244; Tr. 1310-11 (Sank).

77

suffered from this dysfunction and, in my view, is threatened with much more grievous harm to its long-term prospects if the dysfunction is not addressed.

### 3. The Stockholders' Inability to Break the Directors' Deadlocks

The third condition of Section 226(a)(2) is whether the stockholders of the Company are unable to terminate the division between the directors. This condition plainly exists. As demonstrated by the stipulation they entered on December 5, 2014, which provided the basis for the finding of deadlock under Section 226(a)(1), the three stockholders of the Company have been unable to elect successor directors.

Additionally, Shawe and Elting have behaved functionally at all times relevant to this case as if they were 50-50 owners of the Company.[312] Although Shawe's mother holds one percent of the Company, there is zero chance as a practical matter that she ever would align herself with Elting, and, thus, there is no prospect that the stockholders ever will be able to resolve the divisions between Shawe and Elting as the Company's only directors.

### C. A Custodian Will be Appointed to Sell the Company to Resolve the Stockholder and Director Deadlocks

Even when the requirements of Sections 226(a)(1) or (a)(2) have been satisfied, the appointment of a custodian is not mandatory, but is committed to the Court's

---

[312] Although 8 *Del. C.* § 273 technically does not apply because TPG has three stockholders, this case in substance involves the type of 50-50 deadlock that Section 273 was intended to address.

78

discretion.[313]  A custodian appointed under Section 226 shall "continue the business of the corporation and not . . . liquidate its affairs and distribute its assets, except when the Court shall otherwise order."[314]  The Court has explained that "the notion of remedying an 'injustice' informs the Court's discretion, first, whether to appoint a custodian and, second, in establishing the scope of such custodian's authority.  Deadlock, itself, is not an injustice.  The consequences of that deadlock for the stockholders and the enterprise must be assessed."[315]

Elting argues that the Court should appoint a custodian to sell the Company because "[t]he trial record shows that it is no longer possible, even with a custodian in place, to 'continue the business' with Elting and Shawe as its co-owners, and that the only equitable result – for both the Company itself and the stockholders – is for the custodian to maximize value for all concerned by selling the Company to the highest bidder."[316] Elting further argues that, absent this remedy, she will be left with "the Hobson's choice of remaining locked with Shawe in corporate hell or cashing out her stake for a fraction of its true value," affording Shawe a windfall.[317]

---

[313] Section 226(a) provides that "[t]he Court of Chancery . . . *may* appoint 1 or more persons to be custodians[.]"  8 *Del. C.* § 226(a) (emphasis added).

[314] 8 *Del. C.* § 226(b).

[315] *Miller*, 2009 WL 554920, at *5 n.19.

[316] Elting's Post-Trial Op. Br. 26.

[317] Elting's Post-Trial Ans. Br. 2.

Relying heavily on the Company's profitability to date and minimizing his disagreements with Elting as mere "squabbles," Shawe opposes the appointment of a custodian for any purpose. He further contends that "[a]ppointing a custodian with the authority to participate in Company management would risk grave damage to TPG's business" and that a custodian "should not be authorized to sell the Company, or otherwise impose a 'buy/sell' process that requires Shawe to pay Elting more in order to preserve his ownership than a third party would pay to acquire her shares."[318]

There are essentially three alternatives available in my estimation to address the Section 226 claims in this case. The first option is to decline to appoint a custodian and leave the parties to their own devices. I reject that option. The state of management of the Company is one of complete and utter dysfunction that is causing the business to suffer and threatens it with irreparable harm notwithstanding its profitability to date, and it would be unjust to leave Elting with no recourse except to sell her 50% interest in the Company. For the same reasons I have found Elting's distrust of Shawe to be justified, Shawe's actions have cast a pall on the prospect that a third party would pay a fair price for her shares. What rational person would want to step into Elting's shoes to partner with someone willing to "cause constant pain" and "go the distance" to get his way? To afford no relief in this circumstance would be unjust in my opinion. As a former

---

[318] Shawe's Post-Trial Op. Br. 79, 81.

Chancellor of this Court once stated: "Quite simply, equity will not suffer a wrong without a remedy."[319]

The second option is to appoint a custodian to serve as a third director or some form of tie-breaking mechanism in the governance of the Company. I reject this option because it would enmesh an outsider and, by extension, the Court into matters of internal corporate governance for an extensive period of time. Shawe and Elting are both relatively young. Absent a separation, their tenure as directors and co-CEOs of the Company could continue for decades. It is not sensible for the Court to exercise essentially perpetual oversight over the internal affairs of the Company.

The final option is to appoint a custodian to sell the Company so that Shawe and Elting can be separated and the enterprise can be protected from their dysfunctional relationship. Although it is unusual, this Court occasionally has appointed custodians to resolve deadlocks involving profitable corporations and authorized them to conduct a sale of the corporation.[320] In my opinion, such a remedy should be implemented only as a last

---

[319] *Weinberger v. UOP, Inc.*, 1985 WL 11546 (Del. Ch. Jan. 30, 1985), *aff'd*, 497 A.2d 792 (Del. 1985) (TABLE).

[320] *See Bentas v. Haseotes*, 769 A.2d 70, 73 n. 3 (Del. Ch. 2000) (granting summary judgment to appoint custodian to resolve a deadlock arising under Section 226(a)(1) for a "solvent and profitable corporation"). In a subsequent opinion, the Court granted the custodian's motion to order an auction of the corporation. *See Bentas v. Haseotes*, 2003 WL 1711856 (Del. Ch. Mar. 31, 2003).

In *Fulk v. Washington Service Associates, Inc.*, the Court appointed a custodian to formulate and execute a plan to sell a corporation that had "consistently been profitable and [had] achieved attractive margins and a solid record of generating cash without incurring any debt." *Fulk*, 2002 WL 1402273, *2 (Del. Ch. June 21, 2002). It appears that this relief was implemented after the parties had come to agree that the corporation

resort and with extreme caution, but it is appropriate and necessary in this case. Having conducted a six-day trial, decided at least sixteen motions, held numerous lengthy hearings, and considered carefully the documentary evidence and credibility of the witnesses along with the parties' extensive submissions, the painfully obvious conclusion is that Shawe and Elting need to be separated from each other in the management of the Company for its own good. Their dysfunction must be excised to safeguard the Company.

I am unpersuaded by Shawe's argument that ordering a sale of the Company will afford Elting an unfair windfall because she did not obtain at the bargaining table a contractual right to exit her investment in the Company. It is true that Shawe and Elting never came to terms on a buy/sell mechanism, but they also never came to terms on any other form of agreement to govern the management of the Company, such as an operating agreement or a stockholders agreement, the terms of which might influence the analysis of whether relief under Section 226 is warranted.[321] As such, the provisions of the Delaware General Corporation Law, including those afforded under Section 226, apply by default. For the reasons stated above, the requirements of two separate subsections of

---

needed to be dissolved. *See* Tr. of Oral Arg. at 3, *Fulk v. Wash. Serv. Assocs., Inc.*, C.A. No. 17747 (Del. Ch. June 4, 2001).

[321] *See, e.g.*, *Blaustein v. Lord Baltimore Capital Corp.*, 2013 WL 1810956, at *17 (Del. Ch. Apr. 30, 2013) (concluding, in a closely-held corporation, that a breach of fiduciary duty claim with respect to the board's rejection of minority stockholder plaintiffs' stock repurchase proposal was foreclosed by a shareholders' agreement that "provides an explicit process by which the parties intended for share repurchases to occur"), *aff'd*, 84 A.3d 954 (Del. 2014).

Section 226 have been satisfied here and it would be unjust not to exercise my discretion to afford relief under the unique circumstances of this case.

I am equally unpersuaded by Shawe's contention that his so-called "squabbles" with Elting can be easily resolved. The areas of deadlock described above are not mere squabbles; they reflect systemic divisions in the management of the Company. The parties have had literally years to attempt to resolve them, but they have failed to do so despite repeated attempts.

On the other side of the ledger, I am unpersuaded by Elting's argument that conditions should be imposed on a sale of the Company as a form of sanction, such as entry of an order that would preclude Shawe from bidding to acquire the Company, impose on him a non-competition agreement if the Company were sold to someone else, or afford Elting matching rights.[322] Such measures would be unduly punitive in my judgment.[323] The distinct possibility also exists that Shawe would be the most logical purchaser of the business or that a third party would be unwilling to acquire the Company without securing his participation and expertise.[324]

For the reasons stated, and subject to his acceptance of the position, I am appointing Robert B. Pincus, Esquire, who became familiar with the Company through

[322] Br. in Support of Elting's Motion for Sanctions 2.

[323] As noted previously, the issue to be decided in resolving the Sanctions Motion is whether all of Elting's attorneys' fees and expenses should be shifted to Shawe.

[324] Numerous witnesses testified at trial to the effect that Shawe's contributions to the operations and current success of the business significantly exceed the contributions made by Elting.

his previous service as a mediator, as a custodian to oversee a judicially ordered sale of the Company. In the interim, I appoint Mr. Pincus to serve as a third director with the authority to vote on any matters on which Shawe and Elting cannot agree and which rise to the level that he deems to be significant to managing the Company's business and affairs.[325]

A form of implementing order accompanies this opinion. In that order, I ask Mr. Pincus to evaluate and report back to the Court as promptly as practicable after confirming his acceptance of the position on a proposed a plan to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders. In particular, I request that the Custodian evaluate the viability and the pros and cons of conducting a sale of the Company (a) in which the bidders would be limited to Shawe and Elting (individually or as part of a group), such as in a "Texas shoot out" or some other auction format,[326] (b) in an open auction process that would include any interested bidders, or (c) in any other format the Custodian deems practicable in the circumstances of this case, which could include conducting a public offering to afford stockholders liquidity or dividing the operating assets of the Company along the

---

[325] *See Bentas*, 769 A.2d at 79.

[326] A "Texas shoot out" format is an auction process in which either Shawe or Elting would specify a price for his/her interest in the Company and the other would have the option either to buy the other's interest at the specified price or to sell his/her own interest at that price. Ms. Shawe's one percent interest also would need to be taken into account.

production divisions that Shawe and Elting have separately managed.[327] "Although competitive bidding is highly desirable, where it is possible and appropriate to the circumstances involved, the fiduciary who is selling the asset should adopt whatever course of action persons of 'prudence, discretion, and intelligence' would choose under the circumstances to assure that the asset brings the best price obtainable."[328]

## D. Equitable Dissolution is Not Warranted

In addition to seeking the dissolution and sale of TPG under the two provisions of Section 226 discussed above, Elting seeks the same relief under this Court's inherent authority to order dissolution of a Delaware corporation as an equitable matter.

The doctrine of equitable dissolution operates differently than Section 226. Under Section 226, a stockholder need not establish that a director engaged in misconduct as a prerequisite to relief, although the existence of misconduct would be a factor to consider in the Court's exercise of discretion in deciding whether to appoint a custodian and what scope of authority to assign to a custodian. The doctrine of equitable dissolution, by contrast, may be invoked in the absence of any stockholder- or board-level deadlock but it is reserved for situations involving egregious misconduct in the exercise of one's fiduciary responsibilities. As the Court in *Carlson v. Hallinan*[329] explained:

---

[327] Similar alternatives were explored, but not ultimately approved, in *Bentas*. *See Bentas*, 2003 WL 1711856, at *1-2, *4 n. 13 (holding that the Court had the power to order an asset division under 8 *Del. C.* § 226(b)).

[328] *Id.* at *4 n.13 (quoting *Lockwood v. OFB Corp.*, 305 A.2d 636, 638 (Del. Ch. 1973)).

[329] 925 A.2d 506 (Del. Ch. 2006), *clarified by* 2006 WL 1510759 (Del. Ch. May 22, 2006).

This Court may order the dissolution of a solvent company and the appointment of a custodian or receiver "only upon a showing of gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented." The Court exercises this power to dissolve a solvent corporation with "great restraint" and only upon a "strong showing." "Mere dissension among corporate stockholders seldom, if ever, justifies the appointment of a receiver for a solvent corporation. The minority's remedy is withdrawal from the corporate enterprise by the sale of its stock."[330]

In *Carlson*, the corporation's board consisted of three directors. Two of the directors (Hallinan and Gordon) together held 70% of the corporation's stock, and the remaining 30% of the shares were held by an entity affiliated with the third director (Carlson). The Court found that the "facts and circumstances . . . comprise[d] the very rare case" to warrant dissolution of a solvent corporation because "Hallinan and Gordon repeatedly breached their fiduciary duties in a continuing effort to enrich themselves" at the expense of the corporation and its remaining stockholder, and because they had "prevented Carlson from having any meaningful role in the oversight" of the corporation "despite his position as a director."[331]

---

[330] *Id.* at 543 (internal citations omitted); *see also Zutrau v. Jansing*, 2013 WL 1092817, at *5-6 (Del. Ch. Mar. 18, 2013) (finding sufficient allegations of fraud and gross mismanagement " 'that might, at some later stage, lead to the Court's appointment a custodian to the corporation' " (quoting *Andreae v. Andreae*, 1992 WL 43924, at *9 (Del. Ch. Mar. 3, 1992))); *Weir v. JMACK, Inc.*, 2008 WL 4379592, at *2 (Del. Ch. Sept. 23, 2008) (declining to order equitable dissolution for "relatively minor regulatory misconduct.");

[331] *Carlson*, 925 A.2d at 543.

Last year, in *VTB Bank v. Navitron Projects Corp.*,[332] Vice Chancellor Noble explained that the Court of Chancery "has the inherent equitable power to appoint a receiver for a Delaware limited liability company even where this remedy is not expressly available by statute or under the operative company agreement."[333]  After examining *Carlson* and other decisions in which equitable dissolution had been sought in this Court,[334] the Vice Chancellor held that an equitable receivership is a remedy and not an independent cause of action and, thus, the petitioner must prove an underlying claim to obtain such relief:  "Therefore, whether [the plaintiff] may prevail on its remedial equitable receivership claim depends *per force* on whether it successfully proves its primary claims for fraudulent transfers."[335]  I agree with the Court in *VTB Bank* that a petitioner must prove an underlying claim to obtain the remedy of equitable dissolution.

Here, Elting has not pressed an underlying claim against Shawe, such as a claim for breach of fiduciary duty, as a basis for seeking the remedy of equitable dissolution.[336] She instead seeks the imposition of such a remedy by asserting in general terms that

---

[332] 2014 WL 1691250 (Del. Ch. Apr. 28, 2014).

[333] *Id.* at *5 (citing *Ross Hldg. & Mgmt. Co. Advance Realty Gp.*, LLC, 2010 WL 3448227, at *6 (Del. Ch. Sept. 2, 2010)).

[334] The Court also examined *Drob v. National Park, Inc.*, 41 A.2d 589, 597 (Del. Ch. 1945) and *Zutrau*, 2013 WL 1092817, at *6.

[335] *VTB Bank*, 2014 WL 1691250, at *5-6.

[336] Elting initially asserted a claim against Shawe for breach of fiduciary duty, but later dropped that claim.

Shawe engaged in a litany of acts of misconduct.[337] By proceeding in this manner, Elting has not framed the issues to provide Shawe fair notice of the legal basis on which he has been accused of wrongdoing, or for the Court to conduct a rigorous analysis of the legal basis for her various assertions of wrongdoing. Elting's post-trial briefs, for example, make no effort to explain how any of Shawe's specific acts was the product of a breach of the fiduciary duty of loyalty.[338] Having failed to press any underlying cause of action against Shawe, Elting has failed to carry her burden to prove a necessary prerequisite for the imposition of the remedy of equitable dissolution. For this reason, her "claim" for equitable dissolution fails for a lack of proof.

---

[337] The asserted acts of misconduct are that Shawe (i) enlisted the Chief Information Officer and Chief Operating Officer in a "payroll takeover that involved cutting the computer access of the Company's payroll manager"; (ii) signed "false employment letters with multiple new employees to make hires without Elting's knowledge and over her objection"; (iii) unilaterally terminated the Company's PR firm and real estate broker; (iv) issued a false press release purportedly on behalf of the Company; (v) broke "into Elting's office, dismantl[ed] her computer, and cop[ied] her hard drive in order to read her privileged Gmails"; (vi) ordered Trujillo "to intercept Elting's mail and deliver it to him so that he could read correspondence from her lawyers"; (vii) placed "scores of employees at the center of the dispute, including by sending them a false memo from the Company's compromised accountant accusing Elting of 'collusion' "; (viii) refused to produce and spoliated text messages and personal emails with employees, (ix) physically confronted Elting in her office, "fil[ed] a false police report, [sought] her arrest, and mov[ed] for a restraining order against her"; (x) refused to permit an audit of the Company's financial statements; and (xi) used the Company's outside lawyers and accountants to assist him in the litigation and caused "them to be paid with Company funds over Elting's objection." Elting's Post-Trial Op. Br. 6-7.

[338] I previously found that Elting had stated a colorable claim against Shawe for breach of fiduciary duty relating to the issuance of the false press release on September 8, 2014. Tr. of Oral Arg. 35 (Sept. 18, 2014). Other actions taken by Shawe (*e.g.*, falsifying corporate records to unilaterally hire employees) may also implicate potential breaches of fiduciary duty owed to the Company. But those claims have not been placed before me for a final determination, and, thus, I reach no conclusion with respect to them.

Even if I were to engage in a holistic assessment of Shawe's conduct removed from considering the merits of a specific underlying cause of action against him, as Elting suggests, I would decline to order the remedy of equitable dissolution based on the record before me. Unlike in *Carlson*, the record does not show that Shawe engaged in self-dealing or financially enriched himself at the Company's expense. Additionally, many of the cited acts of misconduct (*e.g.*, intercepting Elting's mail, copying her hard drive, reading her privileged Gmails, filing a police report against her, etc.) were aimed at Elting personally. To be sure, those actions demonstrate the dysfunction in the Company's management, the basis for Elting's justifiable distrust of Shawe, and the need for relief under Section 226 to resolve proven deadlocks, but it is not self-evident that these actions amount to egregious breaches of fiduciary duty. In addition, other asserted acts of misconduct, such as those relating to the alleged spoliation of evidence, form the basis of the Sanctions Motion that will be the subject of a separate evidentiary hearing. In sum, the asserted acts of misconduct committed by Shawe that Elting has identified—although disturbing and contrary to expected norms of behavior—do not establish the very high level of fiduciary misconduct resulting in harm to the Company or its stockholders (in their capacity as stockholders) necessary to impose the remedy of equitable dissolution.

\* \* \* \* \*

For the foregoing reasons, Elting's claims for the appointment of a custodian under Section 226 are granted, and her request for equitable dissolution is denied. An implementing order accompanies this opinion.

## IV. LEGAL ANALYSIS – SHAWE'S CLAIMS AGAINST ELTING

In his Verified Complaint (C.A. No. 9686-CB), Shawe alleged seven direct and derivative claims against Elting in her capacity as a director, co-CEO, and 50% stockholder of the Company. His derivative claims were for waste (Count I); breach of fiduciary duty (Count II); and indemnification (Count VI). His direct claims were for breach of fiduciary duty (Count III); unjust enrichment (Count IV); breach of contract based on the August Agreement (Count V); and indemnification (Count VII). Shortly before trial, Shawe sought to amend his pleading to add two additional breach of contract claims (one direct and one derivative) relating to Elting's alleged breach of certain confidentiality provisions arising from settlement discussions and a mediation.[339]

Shawe dropped his contract claim concerning the August Agreement (Count V) after trial.[340] He did not put forth any probative evidence at trial in support of the unjust enrichment claim, the other breach of contract claims, or the indemnification claims, nor did he present any argument in support of those claims in his post-trial submissions. Consequently, Shawe has waived those claims.[341] Shawe's remaining claims for breach of fiduciary duty and waste are analyzed below.

---

[339] Pre-Trial Stip. ¶¶ 106, 108-114.

[340] Stip. and Scheduling Order ¶ 3 (Apr. 22, 2015).

[341] *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *14 (Del. Ch. Apr. 20, 2015).

90

Shawe contends that Elting "engaged in a pattern of conduct that is both self-interested and an abdication of her duty to exercise business judgment."[342] He seeks monetary damages for several, allegedly self-interested transactions with the Company: the April 2013 tax payments (because approximately $8 million of the $21 million in taxes owed that year was paid from the Company instead of the LLC) and the Company's payments to Kramer Levin ($144,163.83), Kidron ($15,194.46), and Elting's housekeeper ($436,946.67 incurred over many years).[343] As to Elting's alleged abdication of her business judgment, Shawe cites her "refusal to approve acquisitions, leases, new hires, lawyers' fees for patent litigation, and internal control reforms." Shawe further contends that Elting attempted to "sabotage" the Company's business with Goldman Sachs, Bank of America, and Cushman & Wakefield,[344] and he seeks a permanent injunction barring Elting from breaching her fiduciary duties.[345]

---

[342] Shawe's Post-Trial Op. Br. 61.

[343] Shawe also seeks an order requiring Elting to join Shawe in transferring $8.15 million from the LLC to the Company, reflecting the approximately $8.15 million that was held by the LLC at the time Elting caused the Company to pay the stockholders' April 2013 tax obligations. *Id.* 93-94.

[344] *Id.* 61.

[345] *Id.* Specifically, Shawe seeks an order:

(a) declaring that Elting has breached her fiduciary duties, including the duty of loyalty, and (b) permanently enjoining Elting from further breaches of fiduciary duty by linking her personal interests in receipt of distributions or other payments from TPG to the exercise of her business judgment with respect to (i) approval of mergers and acquisitions, (ii) approval of leases for office space, (iii) reforming the Company's internal controls, (iv) employee compensation and the hiring and firing of employees,

91

In addition to contending that Shawe failed to prove his claims at trial, Elting raises the affirmative defenses of unclean hands and acquiescence.[346] She invokes the equitable maxim that "he who comes into equity must come with clean hands"[347] to argue that Shawe's "inequitable conduct before and during this litigation . . . relates directly to the matter in controversy and should preclude [him] from recovering on any of his claims."[348]

Directors of a Delaware corporation owe fiduciary duties of care and loyalty to the corporation and to its stockholders.[349] The duty of care requires the "exercise [of] an informed business judgment."[350] The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[351] "To that end, a director may not allow his self-interest to jeopardize his

---

> (v) whether the Company should undergo an audit and (vi) any other business matters that require the exercise of informed business judgment.

He also seeks a full accounting of and access to the books, records and financial systems (including accounts related to banking and payroll) of the Company and its subsidiaries. *Id.* 94-95.

[346] Answer (C.A. No. 9686-CB) ¶ 129.

[347] *Bodley v. Jones*, 59 A.2d 463, 469 (Del. 1947).

[348] Elting's Post-Trial Ans. Br. 31.

[349] *See Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

[350] *McMullin*, 765 A.2d at 921.

[351] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

unyielding obligations to the corporation and its shareholders. A director must, therefore, exercise good faith in advancing the corporation's interests."[352]

A claim for breach of fiduciary duty, like a claim for waste,[353] sounds in equity. As such, Shawe's claims are subject to equitable defenses, including unclean hands. Under that longstanding equitable doctrine, "a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim, regardless of its merit."[354]

> [T]he purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy.[355]

"[T]he conduct that renders a plaintiff's hands 'unclean' must also relate directly to the matter in controversy."[356]

I hold that Shawe's "abdication of business judgment" and "sabotage" claims are barred by unclean hands. As discussed above, Shawe and Elting both engaged in a dysfunctional system to manage the Company's business through "mutual hostaging."

---

[352] *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998), *aff'd*, 725 A.2d 443 (Del. 1999) (TABLE).

[353] *See Sample v. Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007) ("[T]he doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule.").

[354] *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80-81 (Del. Ch. 2008) (citation omitted).

[355] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

[356] *Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 792 (Del. Ch. 1998).

An obvious pattern emerges from the record: (i) when Shawe wanted Elting's approval on something, he withheld his approval on something else until she relented; and (ii) when Elting wanted Shawe's approval on something, she withheld her approval on something else until he relented. The fact that Shawe often (but not always) hostaged distributions rather than other business matters does not preclude a finding of unclean hands because the approval of dividends, as with the approval of acquisitions and other material matters, is a business decision for directors to make.[357] The record reflects a continuous pattern of this conduct throughout the past three years, and that Shawe's participation in this conduct directly relates to the claims he advances here, *i.e.,* Elting's refusal (often short-lived) to approve acquisitions, leases, new hires, the MotionPoint legal expenses, and internal control reforms, as well as her correspondence with Goldman Sachs and Bank of America.

The absence of any binding operating agreement authorizing Shawe or Elting to make certain types of decisions individually enabled both of them to engage in mutual hostaging. How the mutual hostaging began is not consequential, as each successive episode in the Shawe/Elting feud became inextricably intertwined with the episode preceding it, and both Shawe and Elting could be said to have initiated particular episodes. On Shawe's side in particular, the episodes of mutual hostaging evolved into a series of problematic, unilateral actions, such as his falsification of records to hire Shared

---

[357] *See Gabelli & Co. v. Liggett Grp. Inc.*, 479 A.2d 276, 280 (Del. 1984) ("It is settled law in this State that the declaration and payment of a dividend rests in the discretion of the corporation's board of directors in the exercise of its business judgment[.]").

Services employees in August 2014,[358] his email attaching Stone's "collusion" memorandum to over a hundred Company employees in September 2014,[359] and his disparaging press release in September 2014.[360]

The doctrine of unclean hands is not "bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."[361] To wit, "[t]he decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine."[362] Under the circumstances of this case, it would be inequitable to permit Shawe, who was at least equally at fault for the culture of mutual hostaging chronicled above, to castigate Elting for conduct that was part and parcel of their dysfunctional relationship as the Company's only two directors and co-CEOs. Accordingly, and without regard to their merit, Shawe's claims that Elting abdicated her fiduciary obligations and sabotaged the Company's business relationships are denied on the basis of unclean hands.

Shawe's remaining fiduciary claims against Elting concerning the April 2013 tax payments and the payments to Kramer Levin, Kidron, and her housekeeper are also

---

[358] Tr. 1100 (Shawe).

[359] *Id.* 1006-07 (Shawe); JX 768.

[360] Tr. 198-200 (Elting); JX 1172.

[361] *Merck & Co. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, at *44 (Del. Ch. Aug. 5, 1999), *aff'd*, 766 A.2d 442 (Del. 2000).

[362] *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998).

95

barred by the equitable defenses of acquiescence and unclean hands. The doctrine of acquiescence has been described as follows:

> Acquiescence is an equitable defense which is assertable against a party who remains inactive for a considerable period of time, or who recognizes the validity of the complained of act or who acts in a manner inconsistent with the subsequent repudiation and thus leads the other party to believe the act has been approved. Application of the standards underlying the defense of acquiescence is fact intensive, often depending . . . on an evaluation of the knowledge, intention and motivation of the acquiescing party.[363]

The party against whom an acquiescence defense is asserted must have knowledge of its rights and the material facts.[364]

Shawe complains that Elting improperly had the Company pay salary and benefits to her housekeeper, but he admitted he knew about these payments, which had been made for over a decade.[365] Indeed, throughout the same period, the Company paid benefits for Ms. Shawe and for Shawe's then-fiancée, and paid rent for Shawe's apartments.[366] This was all part of the compensation true-up that had been an annual occurrence until Shawe unilaterally stopped that process in January 2014. Given these circumstances, Shawe acquiesced in the payments to Elting's housekeeper.

---

[363] *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001).

[364] *See NTC Gp., Inc. v. W. Point-Pepperell, Inc.*, 1990 WL 143842, at *5 (Del. Ch. Sept. 26, 1990) ("Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.").

[365] Tr. 36-37, 51-53 (Elting); *id.* 746-47 (Shawe); *see also* Stone Dep. 147.

[366] Tr. 52-53 (Elting); *id.* 746-47 (Shawe); *id.* 1468-69 (Stone); JX 127.

Likewise, after Shawe learned that the Company had paid the entire amount of the $21 million in estimated taxes due in April 2013, instead of having the LLC pay approximately $8 million of that amount as he desired, he expressly informed Signature Bank in April 2013 to "let the tax checks be cashed when they come in."[367] Permitting Signature Bank to allow the checks to be cashed was an act of acquiescence in Elting's conduct, which precludes Shawe from recovering on that claim here.[368]

Furthermore, Shawe's claims against Elting for the Company's payments to Kramer Levin and Kidron are barred by unclean hands. Elting had the Company make those initial payments—which she understood from the outset would be addressed as part of the annual compensation true-up in January 2014—upon the recommendation of Stone, the Company's long-time accountant.[369] The only reason the 2014 compensation true-up did not occur is because Shawe prevented it.[370] It would be inequitable to permit Shawe to renege on the parties' longstanding course of dealing and recover on a fiduciary

---

[367] JX 288; Tr. 1038 (Shawe).

[368] Shawe contends that the use of Company funds to cover $8 million of the $21 million of estimated taxes owed in April 2013 caused a cash crunch and led to complaints from vendors whose payments were delayed. Shawe provided no persuasive evidence that the Company suffered any cognizable harm as a result of this action. As he admitted, the Company did not even utilize its $15 million credit line with Signature Bank after the April 2013 tax payments, Tr. 1039 (Shawe), and Shawe asserted a year later there "never has been[] any crisis related to taxes at TransPerfect." JX 724.

[369] JX 487; Tr. 1469-70 (Stone).

[370] Tr. 1058-59 (Shawe); *id.* 1470 (Stone); JX 2031 at EE_00001631.

claim based on a compensation true-up that did not occur because of his own peremptory action.[371]

For the reasons set forth above, I conclude that Elting is entitled to judgment in her favor for each of the direct and derivative claims Shawe asserted against her. An order dismissing these claims with prejudice accompanies this opinion.

## V. LEGAL ANALYSIS – DISSOLUTION OF THE LLC

In her Verified Petition for Dissolution (C.A. No. 9661-CB), Elting seeks dissolution of the LLC under 6 *Del. C.* § 18-802, which provides as follows:

> On application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement.

As then-Vice Chancellor Strine explained when granting a petition for dissolution in *Vila v. BVWebTies LLC*,[372]

> when an LLC agreement requires that there be agreement between two managers for business decisions to be made, those two managers are deadlocked over serious issues, and the LLC agreement provides no alternative basis for resolving the deadlock, it is not "reasonably practicable" to continue to carry on the LLC business "in conformity with [its] limited liability company agreement."[373]

---

[371] It also would be inequitable to afford Shawe relief for the Kramer Levin and Kidron invoices when he has not provided the Court with a complete picture of the true-up process that would shed light on how his own expenses have been handled historically in the true-up process. As noted above, I have no doubt that Gerber, which demonstrated overt favoritism to Shawe by the time of trial, would have produced the records relating to the true-up process if Shawe requested them.

[372] 2010 WL 3866098 (Del. Ch. Oct. 1, 2010).

[373] *Id.* at *7.

98

For the reasons explained below, under the rule articulated in *Vila*, Elting's petition to dissolve the LLC will be granted because Shawe and Elting, who must jointly approve any act the LLC takes, are deadlocked over the LLC's business and there is no contractual mechanism to resolve that deadlock.

Shawe and Elting are the only members of the LLC, and each owns a 50% interest. The LLC does not have an operating agreement, and thus Shawe's and Elting's approval is required under *6 Del. C.* § 18-402 for the LLC to take any action.[374]

Shawe and Elting periodically have funded the LLC with distributions from the Company. When they have done so, the Company also made a *pro rata* distribution to Ms. Shawe for her 1% interest in the Company.[375]

Since its formation, the LLC has held various liquid assets, primarily Treasury bills. The LLC periodically has sold these assets and distributed the proceeds to Shawe and Elting for their personal use. The assets of the LLC have never been used for the benefit of the Company, such as to fund an acquisition or to pay legal expenses.[376] As of trial, the LLC held approximately $8 million in liquid assets. It appears that the LLC has no creditors or liabilities.

---

[374] That provision states, in relevant part: "Unless provided in a limited liability company agreement, the management of a limited liability company shall be vested in its members in proportion to the then current percentage or other interest of members in the profits of the limited liability company owned by all of the members, the decision of members owning more than 50 percent of the said percentage or other interest in the profits controlling[.]"

[375] Tr. 62 (Elting).

[376] *Id.* 63 (Elting); Stone Dep. 120-21.

Elting contends that the LLC should be dissolved because it has no business (because she and Shawe never agreed to one) and, even if they had agreed to a business, it is no longer reasonably practicable to carry on that business due to their deadlock over the use of funds currently in the LLC.[377] Shawe responds that "the LLC was established to protect TPG's assets while leaving them available for business purposes should they be needed."[378] He further submits that Elting's manufactured refusal to use the LLC's funds for these purposes is an insufficient basis to dissolve the LLC.

The record supports the assertion that the LLC was intended to serve as an asset protection vehicle.[379] What is less clear from the record is how the parties intended to use the assets in the LLC after funds were transferred to it. Stone testified that he first suggested the LLC in 2009 to protect Shawe's and Elting's distributions from the Company from liability "but still have them available to the corporation in the event it was needed."[380] In August 2009, when the parties were still considering forming the LLC, Elting noted that "we can always put the money back."[381] A year later, Stone suggested to Elting and Shawe that they move $5-7 million to the LLC because "[t]here

---

[377] Elting's Post-Trial Op. Br. 32.

[378] Shawe's Post-Trial Op. Br. 92-93.

[379] Tr. 61-62 (Elting); *id.* 621 (Shawe); *id.* 1409-10 (Stone).

[380] *Id.* 1410 (Stone).

[381] JX 44.

is too much cash in the corp," noting that "[i]f you need funds for TPT related things, we can put it back."[382] There are similar emails dated February 2012 and December 2012.[383]

On the other hand, in the six years since its formation, the LLC has not conducted any business other than investing in liquid assets and distributing the proceeds from those assets to Shawe and Elting.[384] In August 2013, before litigation commenced, Stone informed Elting and Shawe in an email that in order to serve its asset protection function, "the LLC needs to be conducting business," which it still was not doing at the time.[385] He further stated that it would defeat the purpose of the LLC if it conducted "translation business," and suggested investing in real estate.[386] That type of investment might serve some purpose indirectly related to the Company, such as owning corporate apartments,[387] but would make it difficult to readily allow the LLC to transfer funds back to the Company.

"In determining whether it is reasonably practicable to carry on the business of the LLC, the Court must look to the purpose clause set forth in the governing

---

[382] JX 80.

[383] JX 132; JX 180.

[384] JX 74.

[385] JX 335; Tr. 1457-61 (Stone).

[386] JX 335; *see also* JX 74.

[387] *See* Tr. 621-22 (Shawe).

agreements[.]"[388]   Here, because there is no operating agreement, I must determine the

LLC's purpose based on the trial record.  Although the record does not reveal a precise

answer to this question, the weight of the evidence reflects that the LLC was intended to

serve two different purposes:  (i) to serve as an asset protection vehicle, with the potential

to return funds to the Company or make investments that would have a tangential

corporate purpose; and (ii) to distribute money to Shawe and Elting.  The LLC has never

transferred any money back to the Company in furtherance of the first purpose, but it has

distributed money to Shawe and Elting on multiple occasions in furtherance of the second

purpose.

Taking into account the two apparent purposes of the LLC, Shawe and Elting are

in deadlock over what to do with the LLC's assets such that it is not reasonably

practicable to carry on the LLC's business.  Shawe wants to keep the $8 million in funds

currently in the LLC available for corporate purposes and maintain the LLC as an asset

protection vehicle.[389]   Elting wants all the money distributed to her and Shawe as the

LLC's two members.[390]   There is no agreed-upon mechanism, such as a dispute

---

[388] *In re Senecca Invs. LLC*, 970 A.2d 259, 263 (Del. Ch. 2008) (dismissing a petition to dissolve a limited liability company where the purpose clause of the operating agreement authorized the company "to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law").

[389] Tr. 621 (Shawe).  This position conflicts with his demand in April 2013 that the LLC use essentially all of its assets at the time to cover part of Shawe and Elting's tax liabilities that quarter.  JX 280; Tr. 1029-31 (Shawe).

[390] Tr. 65 (Elting).

resolution provision in a written operating agreement, to resolve that deadlock.[391] As such, the LLC is serving neither of its two possible purposes and there is no reasonable prospect that it will serve either purpose in the future. In sum, given the LLC's ownership structure, the deadlock, and the inability to resolve the deadlock, it is not reasonably practicable to carry on the business of the LLC.[392] The standard for judicial dissolution of the LLC thus has been met.

"[I]n the case where the standard for judicial dissolution is met, the ultimate determination of whether a decree of dissolution should issue is committed to this court's equitable discretion."[393] In my judgment, the LLC should be dissolved. Judicial dissolution is "the only practical deadlock-breaking remedy available" to Elting as a 50% member of the LLC.[394] Under 6 *Del. C.* § 18-804(a), and unless otherwise provided in a

---

[391] *See Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2010 WL 3314484, at \*23-24 (Del. Ch. Aug. 2, 2010) (observing that a party "may not seek judicial dissolution simply as a means of freeing itself from what it considers a bad deal" in a case where the petitioner failed to prove any contractual or fiduciary misconduct and where the operating agreement contained a dispute resolution mechanism in the form of a buy/sell provision).

[392] *See In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at \*12 (Del. Ch. Aug. 18, 2005) ("Given its ownership structure and Operating Agreement, Silver Leaf is no longer able to carry on its business in a reasonably practicable manner. The vote of the members is deadlocked and the Operating Agreement provides no means around the deadlock. Moreover, Silver Leaf has no business to operate. Therefore, upon application of a member, . . . the court dissolves Silver Leaf.").

[393] *Vila*, 2010 WL 3866098, at \*6 (granting a petition to dissolve a limited liability company where the company's two managers were "deadlocked over serious managerial issues, including "a strategic vision for, or the current operation of," the company).

[394] *See Haley v. Talcott*, 864 A.2d 86, 88 (Del. Ch. 2004) (granting a petition to dissolve a limited liability company where the company's two, 50% member/managers were in "deadlock . . . about the business strategy and future of" the company).

limited liability company agreement, the assets of the company shall be distributed to the company's creditors and then to its members. The record does not establish that Shawe and Elting agreed to any different plan of distribution. Therefore, the LLC's assets shall be liquidated and the proceeds of those assets shall be distributed equally to the LLC's members, Shawe and Elting.[395]

The dissolution and liquidation of the LLC should not be a prolonged affair. Accompanying this opinion is an implementing order appointing Robert B. Pincus, Esquire, as liquidating trustee for the LLC and directing Mr. Pincus to submit a plan of dissolution and liquidation within ten business days after receipt of confirmation of his willingness to serve as the liquidating trustee.

## VI. CONCLUSION

For the foregoing reasons, Elting's petitions for dissolution of the Company under 8 *Del. C.* §§ 226(a)(1) and (a)(2) and her petition for dissolution of the LLC under 6 *Del. C.* § 18-802 are granted. Shawe is entitled to judgment in his favor on Elting's other claims for relief. Elting is entitled to judgment in her favor on Shawe's claims for relief. Implementing orders accompany this opinion.

---

[395] As noted above, there is no indication in the record that the LLC has any liabilities or creditors. If there are any liabilities, they must be satisfied before the remaining proceeds are distributed to the members.